[No. 20416. Department Two. February 25, 1927.]

F. D. OAKLEY, *Respondent,* v. G. W. H. DAVIS, *as Director of Efficiency et al., Appellants.*[1]

[1] ATTORNEY AND CLIENT (38)—COMPENSATION—VALUE OF SPECIFIC SERVICES. An allowance of attorneys fees in the sum of $35,000 is warranted by findings to the effect that an attorney of high standing and ability had devoted much of his time for four and one-half years to very important litigation in this and many other states and in the Federal Courts in a very complicated liquidation of an insolvent bank, whereby over three million seven hundred and fifty thousand dollars had been realized for the creditors.

[2] BANKS AND BANKING (7-1)—INSOLVENCY—LIQUIDATION—FIXING ATTORNEY'S FEES—ARBITRARY REFUSAL OF LIQUIDATOR. Findings that the supervisor of banking and his assistant acted arbitrarily throughout, in fixing attorneys fees for legal services in a bank liquidation, are sustained, where it appears that the services, covering a period of over four years, were reasonably worth at least $35,000, that the supervisor, who had been in office only twenty days, without any knowledge of the affairs of the insolvent or the services rendered, or any investigation, fixed the fees at $5,000, and an assistant within three days withdrew that offer and discharged the attorney; and upon being required by the court to fix a reasonable sum, allowed the sum of $15,000 without any showing to the court under oath of the reasons for his determination, or the worth of the services, or that he had taken any steps to ascertain the reasonable value thereof. .

[3] BANKS AND BANKING (7-1)—CONSTITUTIONAL LAW (39)—LIQUIDATION OF INSOLVENT BANKS—JUDICIAL POWERS—ENCROACHMENT

[1]Reported in 253 Pac. 648.

ON EXECUTIVE—ARBITRARY REFUSAL TO EXERCISE DISCRETION. Un-
der Rem. Comp. Stat. § 3271, providing that, in the liquidation
of insolvent banks by the supervisor of banking, he shall fix
reasonable fees for any attorney employed by him "subject to
the approval of the court," the court has power to fix the fees
after the supervisor has arbitrarily refused in the first instance
to fix reasonable fees, and refused to comply with an order of
court requiring him so to do, or to take advantage of a final
opportunity thereafter offered to him to do so.

Appeal from a judgment of the superior court for
Pierce county, Wright, J., entered October 11, 1926,
upon findings in favor of the plaintiff, in an action for
attorney's fees, tried to the court. Affirmed.

*The Attorney General* and *B. B. Adams, Assistant
(Grant Dentler, of counsel)*, for appellants.

*L. L. Thompson,* for respondent.

Tolman, J.—In January, 1921, the Scandinavian-
American Bank of Tacoma became insolvent and passed
into the hands of the state department of banking for
liquidation. F. P. Haskell, Jr., was named as liqui-
dator, and in due course respondent was employed, in
conjunction with Guy E. Kelly and Thomas MacMahon
(respondents in a companion case which was argued
and submitted herewith), as attorney for the liquidator.
There does not appear to have been any special agree-
ment as to compensation. The trial court found:

"That during the month of January, 1921, the said
Claude P. Hay as such commissioner of banking, and
his deputy F. P. Haskell, Jr., employed the plaintiff
herein in conjunction with Guy E. Kelly and Thos.
MacMahon to act as one of the attorneys for them in
the liquidation of the said bank, and the plaintiff herein
then entered into and continued such employment under
the various officials hereinabove named and until the
1st day of June, 1925, and this plaintiff, during such
time, upon their request and with the knowledge, con-
sent and approval of all of such officials, performed

legal services for the said officials in the liquidation of the said bank, as hereinafter set forth.''

Respondent received nothing in the way of compensation for his services or reimbursement for his expenses during the time he was employed. His services were terminated at the request of the department on June 1, 1925. Thereafter this action was instituted, and it was alleged that the department had arbitrarily and capriciously refused to fix and allow reasonable or any compensation; that the services rendered were reasonably worth more than $35,000; that the expenses paid and advanced by respondent amounted to $2,500; and the prayer was that the court by its judgment allow these expenses and fix and allow respondent's compensation at not less than $35,000. A demurrer to the complaint was interposed and overruled. Appellants answered by appropriate admissions and denials, raising issues of fact. A trial was had to the court, resulting in a judgment allowing the expenses as prayed for, fixing the fee at $35,000, and making it a first lien upon the undistributed assets of the bank. The department has appealed, but brings no statement of facts to this court.

Appellants rely for reversal upon three points: (1) Even though the department acted arbitrarily and capriciously, the court has no power to fix the fees. (2) The proof fails to show that the department acted arbitrarily and capriciously in its final fixing of the fee. (3) The fees allowed are exorbitant. We shall treat of these matters in inverse order.

[1] Since no statement of facts is brought here, we are absolutely bound by the trial court's findings of fact and must assume that they are true in every particular and to every intendment. The court found:

"That at the time of the failure of said bank and when the same was taken over for the purpose of liquidation, there were about 10,000 depositors therein with aggregate deposits of over $4,000,000; but there was only the sum of $68,000 in cash on hand, and there was a sum due other banks in excess of $1,000,000, which had been secured by the deposit of securities owned by said bank of the approximate value of $1,500,000, and in the interest of the unsecured creditors of the said bank, it was necessary that such securities be redeemed; that in the raising of the money necessary for such redemption and in the making of such redemption, it was necessary that a large amount of legal services be performed; that at the time of the failure of the said bank, the said bank was actively engaged in the automobile business and there were numerous legal matters constantly arising in the sale of automobiles and the liquidation of the said business, and several other liquidations of a similar character; that prior to the time of the failure of the said bank, the directors of the said bank had organized a corporation under the name of the Scandinavian-American Building Company and were actively engaged in the erection of a sixteen story steel office and bank building in the city of Tacoma, and that said bank had transferred to said Building Company real property worth approximately $300,000 and had loaned said Building Company approximately $500,000; that said purchase price had never been paid and said loan was unsecured except by a mortgage running to G. Wallace Simpson as mortgagee, but which said mortgage the liquidators of the said bank were informed had been delivered to said bank as security for such advances though the assignment thereof had not been recorded; that such steel building was partially completed and large sums were due to laborers and materialmen who had worked and furnished material upon the said building; that immediately upon the failure of the said bank, action was instituted in the United States District Court to foreclose the laborer's and materialmen's liens thereon and it was necessary that the liquidators intervene in such suits to protect the interests of the creditors of the said bank; that said

action involved sums largely in excess of $1,000,000; that there were a multitude of parties thereto; that the liquidators of said bank insisted on establishing the rights of said bank under the mortgage running to G. Wallace Simpson and assigned to the bank. Foreclosure proceedings were therefore instituted in said action and the legal questions arising in said foreclosure procedure were intricate and difficult. That the question of the validity of the mortgage and other payments due to said bank from said Building Company were litigated in the said district court and the decision therein rendered was appealed to and argued in the United States Circuit Court of Appeals for the Ninth District, and no fees were paid by said liquidators for any such legal services. That there were a large number of cashier's checks and drafts outstanding when the bank failed and that the holders thereof claimed to be preferred creditors of the said bank; that shortly after the said bank closed, actions were instituted by two of the holders of said drafts, and that as a result of such litigation, the law was established by the supreme court that such holders were not to be preferred in the assets of the said bank; that said actions were twice argued in the supreme court and the attorneys for the liquidators were obliged to devote a large amount of time thereto and to other claimed preferences made by creditors of the said bank, many of which resulted in litigation; that at the time of the failure of the said bank, the capital stock thereof was distributed among approximately 600 stockholders, many of whom were not residents of the state of Washington; that there was due the liquidators of said bank upon the constitutional superadded liability of such stockholders the sum of $1,000,000; that the law with reference to the liability of stockholders of insolvent banks to pay their constitutional superadded liability was in a very unsettled state and practically all of the stockholders of said bank refused to pay the amount due by reason of their ownership of said stock; and that by reason of the refusal of said stockholders to pay their superadded liability and in order to preserve and enforce the claim and interest of the creditors of

said bank in such stockholders' liability, it was neces-
sary to institute appropriate legal actions against said
stockholders; that some few of the stockholders paid
the liability upon the express agreement with the
liquidators that such payments would be returned to
them in the event that the supreme court of the state
of Washington did not hold them liable and did not lay
down a rule which would be practicable and under
which each individual stockholder's liability could be
determined and collected; that the attorneys for such
stockholders insisted that actions brought in counties
other than the county of Pierce be brought to trial and
that as a result thereof, the attorneys for the liquida-
tors litigated three test cases, one in Yakima county,
one in Pierce county and one in Grays Harbor county,
and that such actions were appealed to the supreme
court after numerous hearings before the trial courts,
twice argued before the supreme court, and the law
therein established; by virtue of which the liquidators
were enabled to collect the superadded liability of the
stockholders; that the bonding company which had
written the fidelity bond covering the employees of the
said bank disclaimed liability thereon, although the
liquidators claimed there was due them from the bond-
ing company under the conditions of such bond, the
full penalty thereof, $50,000, arising from certain acts
and transactions of one O. S. Larson, president of said
bank; that action was instituted thereon and tried both
in the superior and supreme courts, and finally resulted
in recovery of the full amount claimed by the liquida-
tors in excess of $61,000; that the liability of certain
bonding companies that had furnished depository
bonds to secure deposits in the bank made by Pierce
county, Washington, and the city of Tacoma, and the
rights of said bonding companies to subrogation to the
bank assets, required a large amount of legal services
and attention; that during the course of such liquida-
tion the liquidators of said bank engaged the services
of this plaintiff, together with Guy E. Kelly and Thos.
MacMahon, almost exclusively and to the exclusion of
other business; that this plaintiff consulted and advised
with the liquidators daily with reference to various

matters arising in such liquidation and attended to all legal matters arising therein including numerous settlements of controversies, advising with reference to numerous questions of law, drawing contracts and other agreements, writing letters and in the conducting of a large number of litigated matters; that this plaintiff and Guy E. Kelly and Thos. MacMahon instituted numerous suits, approximately 400 in number, in the courts of the state of Washington and in other states, a partial schedule of which is attached to the complaint herein and marked 'Exhibit A' and by reference incorporated herein, for all purposes, and appeared in many petitions and orders in the proceedings in court, a partial list of which is attached to the complaint herein, marked 'Exhibit B,' and by reference incorporated herein. That the liquidators of the said bank have collected, as a result of this litigation conducted by plaintiff and Guy E. Kelly and Thomas MacMahon, or in settlement of matters in liquidation, a sum in excess of one million five hundred thousand dollars; that the liquidators in the liquidation of said bank were compelled to institute suits in various states of the union through this plaintiff and Guy E. Kelly and Thomas MacMahon, including the states of Oregon, California, Missouri, Minnesota, Michigan, Pennsylvania, Illinois, Nevada, and also in Alaska, and that the plaintiff and his associates in each instance and with the assistance of the local attorneys employed by the liquidators for the purpose of instituting said actions prepared the necessary pleadings for such litigation, attended to the taking of various depositions for the purpose of proving the allegations of such pleadings, and in several instances the attorneys for the liquidators actually tried said actions in said foreign courts, and in connection therewith made several trips to San Francisco, Chicago, Detroit, Philadelphia, New York, Pittsburg and Portland, and many trips to the various county seats in the state of Washington, in addition to the ordinary office work required in the liquidation of said bank; that in several instances business concerns were so heavily indebted to said bank at the time of its

failure that the failure of such bank rendered such businesses insolvent, and the liquidators by agreement with the other creditors liquidated the said insolvent businesses, in all of which the plaintiff and his associates performed the necessary legal services. That in addition to the above legal services performed, this plaintiff was requested to give advice on matters of great weight and importance to the liquidators and were required to devote a substantial portion of his time and attention to the affairs of the defunct bank during the period of his employment.

"That there has been collected and paid to the creditors of said defunct bank a sum in excess of three million seven hundred fifty thousand dollars with the assistance of this plaintiff and his associates, and that the interest collected in the course of the liquidation has exceeded by more than one hundred thousand dollars the total amount expended by the liquidators in the collection and reduction of such assets to cash and the distribution thereof, and that the interest collected by litigation, through the efforts of plaintiff and his associates, exceeds the amounts hereinafter found to be reasonable fees for such service."

Without the testimony upon which these findings are based it is very difficult, in some respects, to assess their real value. For instance,

" . . . at the time of the failure of the said bank . . . (it) was actively engaged in the automobile business and there were numerous legal matters constantly arising in the sale of automobiles and the liquidation of the said business and several other liquidations of a similar character."

And, also,

" . . . that this plaintiff consulted and advised with the liquidators daily with reference to various matters arising therein, including numerous settlements of controversies, advising with reference to numerous questions of law, drawing contracts and other agreements, writing letters and in the conducting of a large number of litigated matters.".

Such language may mean much or little, depending upon particular details, which were no doubt clearly brought to the attention of the trial court by the evidence submitted. None of that evidence is contained in the record brought here. We must, therefore, if that be necessary to support the judgment, assume that such findings mean all that the language may reasonably imply.

We can and do more readily understand the findings relating to the litigation which reached this court and the litigation which was carried on in the Federal courts, all or nearly all of which was of a most important character, involving questions of vital importance to the creditors and stockholders of the bank and to the public generally, in which were established many questions of law not theretofore passed upon or clearly settled. Such services, continuing over a period of four years and five months, by an attorney ranking high as to ability, industry and experience, to the practical exclusion of all other business, would seem to well justify an allowance of the sum fixed by the trial court, especially when it is remembered that, outside of the small allowance of $2,500 for extra expenses, the respondent was obliged to maintain his office and usual office force at his own expense, and his net income during the period will be but a modest one. We, therefore, cannot say that the trial court erred in fixing the allowance.

[2] Appellants' second point involves some facts not hereinbefore stated. The trial court found that appellant Johnson became supervisor of banking upon May 1, 1925; that he then had no knowledge of the affairs of the insolvent bank nor of the amount and character of the services rendered by the respondent, and made no investigation thereof prior to the writing

of a letter, on May 25, 1925, to the respondent, in which he said:

"After very careful consideration I hereby fix your compensation now due up to and including May 31, 1925, at $5,000, being in full for services rendered and to be rendered up to and including that date.

"Your continued services are required and compensation is hereby fixed at $300 per month during the future period of liquidation of the defunct Scandinavian-American Bank and all its affiliates and until such time as your legal services are no longer required."

Respondent promptly rejected that proposition and his letter of rejection being received in the absence of Mr. Johnson, the appellant Davis wrote, and caused to be signed by a deputy supervisor, a letter to respondent as follows:

"Your favor of May 28th in regard to your connection with the Scandinavian-American Bank of Tacoma, in which you state that you cannot accept the proposition contained in my letter of May 25th, is received. As my letter of May 25th was based upon the proposition of your continued legal services in connection with the liquidation of the Scandinavian-American Bank of Tacoma, its auxiliaries and subsidiaries, in view of your refusal to accept the provisions of such communication, the said letter and the proposition contained therein is hereby withdrawn; and I hereby fix your compensation now due or to become due up to and including May 31, 1925, at the sum that you have received thus far, being in full for all services rendered in connection with the liquidation of the Scandinavian-American Bank of Tacoma, its auxiliaries and subsidiaries.

"I also wish to advise you that your services will be no longer required from and after May 31, 1925."

The trial court also found that, when he wrote that letter, appellant Davis had no substantial knowledge or information concerning the nature and extent of

respondent's services and made no effort at ascertainment. It further appears that, after hearing the evidence and before making any findings, the trial court made an interlocutory order directing appellant Johnson to fix and allow to the respondent a reasonable fee for his services, and that

". . . pursuant to said order, the said defendant Johnson, continuing his arbitrary and capricious action, and in total disregard of the record herein and of the order of this court fixed the fees of plaintiff at the sum of $15,000, although said services, as shown by the record, were fairly worth a sum considerably in excess of twice that amount. That when the defendant Johnson filed his return to said interlocutory order in this court a hearing was held before this court at which hearing the said defendant was present, but that the said defendant Johnson did not testify at said hearing nor by his testimony seek to inform the court under oath concerning his reasons for fixing the fee of the plaintiff at $15,000, contrary to the record herein."

The court afterwards, at the request of appellants, made supplemental findings as follows:

"I. No evidence, oral or written, was introduced to either prove or disprove whether or not the supervisor of banking, defendant herein, subsequent to the time that the interlocutory order was entered in the above entitled case and prior to his fixing the second fee, investigated the work done by plaintiff in the insolvency proceedings herein involved.

"II. That no evidence, oral or written, was introduced to either prove or disprove the allegations of the defendants' return to the interlocutory order entered herein.

"III. That no evidence, either oral or written, was introduced by either plaintiff or defendants subsequent to the entry of the interlocutory decree herein.

"IV. That no material evidence was introduced by either plaintiff or defendants tending to prove or establish any fact other than set forth in the findings of fact hereby entered.

"V. That, at the time of trial, defendants by their attorneys offered to submit to an order remanding the case to the defendant Johnson, supervisor of banking, with instructions to fix the plaintiff a reasonable fee."

As we read them, these supplemental findings in no wise contradict the record theretofore made and tend only to establish that the appellants made no effort to show to the court that they were in good faith attempting to comply with the interlocutory order. We think the record abundantly established that the department acted arbitrarily throughout, including its final fixing of the fee under the interlocutory order.

[3] We come now to the question of the court's power to fix the fees after a finding of continued arbitrary action on the part of the department. The statute, and the only statute, with reference to the fixing and allowance of such fees is Rem. Comp. Stat., § 3271 [P. C. § 315], which reads:

"All expenses incurred by the examiner in taking possession, administering and winding up any such corporation, including the expenses of deputies and other assistance and reasonable fees for any attorney who may be employed by him in connection therewith, and the reasonable compensation of any special deputy placed in charge of such corporation shall be a first charge upon the assets thereof. Such charges shall be fixed by the examiner, subject to the approval of the court."

Undoubtedly, as contended by appellants, the intent of the legislature was to avoid excessive expenses and charges in all such cases, and it also clearly intended that just and reasonable compensation should be allowed, and to avoid a possibility of arbitrary action by which either too much or too little might be allowed, all allowances were made subject to approval by the court. Can this statute mean, as appellants seem to contend, that the courts must forever go on disapprov-

ing improper allowances and re-referring the matter to an official who has already clearly demonstrated an inability or an unwillingness to make a fair and reasonable allowance? Appellants upon this point seem to rely upon *State ex rel. Brown v. Board of Dental Examiners*, 38 Wash. 325, 80 Pac. 544; *State ex rel. Cowles v. Schively*, 63 Wash. 103, 114 Pac. 901; *State ex rel. Mutual Union Ins. Co. v. Fishback*, 97 Wash. 565, 166 Pac. 799; and *State ex rel. Yeargin v. Maschke*, 90 Wash. 249, 155 Pac. 1064. In none of these cases was the present question necessarily involved, and while, in the opinions referred to, there are to be found expressions to the effect that the discretionary power of an inferior board or officer may not be reviewed by the court, that if such tribunal has acted arbitrarily the court will compel it to act honestly and fairly, or, in other words, to exercise its discretion, and even, as was said in the *Fishback* case,—

"But supposing that the showing here made were such that we could say the commissioner acted arbitrarily or capriciously, it would seem that we could do no more than decide that he should proceed to exercise his discretion. We are unable to see how we could even then lawfully control his discretion."

But the paragraph quoted, which is the last paragraph of the opinion, might well have been omitted as being unnecessary to support the decision already arrived at. However, the statute there considered made the insurance commissioner the judge, made no mention of any authority in the court to pass on the commissioner's judgment, and, in any event, the facts to be determined were such as might be more easily and more correctly determined by the insurance commissioner than by any court; and though the court had power so to do, it might well withhold the exercise of that power until all hope of a fair decision by the com-

missioner was at an end. Judge Parker, who wrote that opinion, also wrote the opinion of the court in *State ex rel. Cowles v. Schively, supra,* wherein we think he more nearly expressed the correct rule when he said:

"In its last analysis, this becomes a question of the judiciary interfering with the executive branch of the state government in a matter involving the exercise of discretion of one of the high officers of the state, concerning a public duty only. Before the judiciary will interfere in such a case, it must clearly appear that such officer has so far departed from the line of his duty under the law, that it can be said he has in fact so far abused such discretion that he has neglected or refused to exercise any discretion. When a private right of a citizen is violated by an executive officer under the guise of official power there is quite a different question presented."

We might proceed on the theory that respondent's services are his property, and that no legislative act may deprive him of the right to receive fair and reasonable compensation therefor without a proper hearing, except in violation of familiar constitutional provisions. But it is unnecessary to enter upon a discussion of that phase of the case. We have examined all of our cases referring to the review by the courts of the acts of boards and officers, and find none which may be considered an authority for appellants' contention. Without attempting to lay down a general rule applicable in all cases, we have no hesitancy in saying that, under the section of the statute here applicable, and hereinbefore quoted, the supervisor, who stands in the same position as the examiner at the time of the enactment, had ample opportunity to exercise his discretion and failed so to do. The trial court, with perhaps more consideration than was required, by the interlocutory order, offered still further opportunity, which was not

used for the purpose intended. To further refer the matter to the department would be useless and idle, resulting probably only in further delay to the detriment of all concerned. In such a case, where there is evidence upon which the amount can be fixed and allowed, the court is not powerless to give relief, but may exercise its discretion and by its judgment make the proper award.

The judgment is affirmed.

MACKINTOSH, C. J., BRIDGES, PARKER, and ASKREN, JJ., concur.