## UNITED NATIONAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67949.  Promulgated December 27, 1935.

*Roger L. Shidler, Esq.*, for the petitioner.
*P. A. Bayer, Esq.*, for the respondent.

### OPINION.

McMAHON: This is a proceeding for the redetermination of a deficiency in income tax for the fiscal year ended June 30, 1930, in the amount of $7,310.68.

It is alleged that the respondent erred in including in petitioner's taxable income a profit of $296,895.25 which petitioner had reported in its return as profit on a purported sale to United Pacific Bond & Share Corporation of certain stocks with warrants, instead of holding that such securities were pledged as security for a loan and not sold, and in disallowing petitioner's claim for refund based upon the claim that such purported profit was erroneously reported as income.

The petitioner prays that this Board determine that there is no deficiency and that the petitioner is entitled to a refund in the sum of $26,717.13.

The petitioner is a corporation organized under the laws of the State of Washington, with its principal place of business at Seattle.

It is a holding corporation and makes investments. The buying and selling of stock is not the principal business of petitioner. Its income is derived principally from dividends.

At and prior to April 7, 1930, the petitioner was engaged in constructing certain buildings. Architects' certificates were being presented and were to be presented in the near future involving a substantial sum of money, and cash was needed by petitioner. The resources of the petitioner at that time were about $19,000,000. It was decided that all necessary resources of the petitioner should be made available to enable it to meet its cash requirements. Prior to April 7, 1930, Ben B. Ehrlichman, president of the petitioner, had discussed with R. M. Drumheller, chairman of the board of directors of petitioner, and Odd O. Young, vice president of both the petitioner and of the United Pacific Bond & Share Corporation, and with others, the subject of petitioner's obtaining a loan from the United Pacific Bond & Share Corporation, which was a subsidiary of petitioner and had the ability to make any necessary credit available. The petitioner was expecting funds from other sources and there was some doubt then as to whether petitioner would need to borrow money. It was, however, finally decided that petitioner would establish credit with the United Pacific Bond & Share Corporation so that it could draw money from that company as and if needed, all by going through the form of a sale and repurchase agreement covering certain securities owned by petitioner. Young, as vice president of petitioner, was instructed to incorporate the agreement in a letter. As a result of the agreement of the parties a letter dated April 7, 1930, was written from petitioner to the United Pacific Bond & Share Corporation, stating in part as follows:

> We hereby confirm sale to you of:
>
> 22,100 shares PUBLIC UTILITY HOLDING CORPORATION, Common stock, W. W. at 26½ a share
>
> 7,808 shares UNITED FOUNDERS CORPORATION, Common Stock, at 44¾ a share and
>
> 21,300 shares UNITED STATES ELECTRIC POWER CORPORATION, Common Stock, W. W., at 22¼ a share.
>
> It is hereby expressly understood and agreed that upon demand, this corporation will repurchase from United Pacific Bond & Share Corporation, and United Pacific Bond & Share Corporation will sell to this corporation all or any of the above described stocks at the same respective prices as herein confirmed.
>
> Kindly indicate your acceptance of and agreement to the above by signing and returning to this corporation the enclosed copy of this letter.

At the bottom of such letter is a statement signed by United Pacific Bond & Share Corporation as follows: " The above agreement is hereby accepted and approved."

The above agreement was signed on behalf of petitioner by W. H. White, its vice president, and on behalf of the United Pacific Bond & Share Corporation by Odd O. Young, its vice president.

The purpose of this transaction was to permit petitioner to draw money from the United Pacific Bond & Share Corporation to the extent of the aggregate value at which the securities were delivered, or $1,408,983. It was intended that the transaction should be a mortgage and not a sale of the securities. The letter was designed to require either party to act on demand of the other. It embodies the method agreed upon by the parties to accomplish the loan. The securities shown in the letter were delivered by petitioner to the United Pacific Bond & Share Corporation. The delivery of the securities by petitioner to the United Pacific Bond & Share Corporation was at the market value at that date. The transaction was treated as a sale of the securities by both the petitioner and the United Pacific Bond & Share Corporation in their purchase and sales slips. The transaction was carried on the books of the petitioner as a sale of these securities and a profit was recorded on the books as of the date of sale in the amount of $296,895.25. The following tabulation shows the manner in which the profit was computed by petitioner from information appearing on petitioner's books:

| Security | Shares | Cost to United National Corporation | Sale price recorded on books of United National Corporation | Repurchase price recorded on books of United National Corporation | Profit recorded |
|---|---|---|---|---|---|
| Public Utility Holding Corporation, common, W. W. | 22,100 | $320,518.00 | $585,650.00 | $585,650.00 | $265,132.00 |
| United States Elec. Power Corporation, common, W. W. | 21,300 | 450,576.00 | 473,925.00 | 473,925.00 | 23,349.00 |
| United Founders Corporation, common. | 7,808 | 340,993.75 | 349,408.00 | 349,408.00 | 8,414.25 |
| | | 1,112,087.75 | 1,408,983.00 | 1,408,983.00 | 296,895.25 |

On or about May 23, 1930, the president of the petitioner conferred with other officers of the petitioner and the United Pacific Bond & Share Corporation and it was decided to redeliver these same securities back to the petitioner, since it was considered that the petitioner did not need the credit any longer. He gave directions that the securities be delivered back to the petitioner and they were so redelivered at the same figure at which they had previously been delivered to United Pacific Bond & Share Corporation. The market value of none of these securities was the same on May 23 as on April 7, 1930. The securities were then restored to the petitioner's books, but at the figure at which they were returned on May 23, 1930, which was the same as that of April 7, 1930.

The president of the petitioner first learned in February 1931 that a profit had been recorded on the delivery of the securities to United Pacific Bond & Share Corporation. He then gave directions to eliminate this profit on the books and to restate the securities on the books at their original cost to petitioner. The recorded profit was charged to surplus and these securities were reduced on the books of the petitioner to the original cost. This was done on the books under date of March 31, 1931, as of February 26, 1931, the latter date being the date that the condition of the records of petitioner was brought to the attention of its officers.

According to petitioner's books, it had, between April 7 and May 23, 1930, a credit of at least $1,408,983 with the United Pacific Bond & Share Corporation, except on April 29 and April 30, when the credit was $1,082,496.

Other securities, not involved or described herein, which were actually sold by petitioner to the United Pacific Bond & Share Corporation, were delivered by the former to the latter at the same time as the securities involved herein.

In the petitioner's income tax return for the fiscal year ended June 30, 1930, there was included a profit on the delivery of the assets in question by petitioner to the United Pacific Bond & Share Corporation in the amount of $296,895.25. At the time he signed this return the president of the petitioner did not know that such profit was included therein. In such return the petitioner reported tax due in the amount of $34,027.99, which amount was paid.

On July 9, 1931, the petitioner filed with the collector of internal revenue for the district of Washington a claim for refund of the amount of $34,027.99 paid pursuant to the return, claiming therein that the profit of $296,895.25 was erroneously reported as income in the return. It was therein stated that the petitioner sold the securities in question to the United Pacific Bond & Share Corporation, a subsidiary, under a repurchase agreement, and that the identical securities were reacquired under the terms of the repurchase agreement on May 23, 1930.

In the notice of deficiency the respondent denied the claim for refund and held that the amount of $296,895.25 was properly reported as income in the return. The respondent stated in part:

This office holds that the letter of April 7, 1930, is not conclusive that no profit was realized on the stocks in question during the taxable year. As shown in said letter repurchase was to be made on demand of the United Pacific Bond and Share Corporation. The demand might never have been made.

The tax shown to be due by the petitioner upon its return was paid within three years before the filing of the claim for refund, which was filed before the petition in the instant proceeding was filed.

Upon the foregoing facts, which we find, the sole question presented for decision in this proceeding is whether the delivery of the securities in question by petitioner to the United Pacific Bond & Share Corporation constituted a sale of such securities resulting in taxable income to the petitioner, as held by the respondent, or constituted a mortgage of such securities to secure indebtedness, as contended by petitioner.

It may be well to say at the outset that although the proof is to the effect that the United Pacific Bond & Share Corporation was a subsidiary of the petitioner, it is stated in petitioner's brief that the two corporations were not affiliated within the meaning of the internal revenue laws; thus eliminating any question as to intercompany transactions.

The governing factor in determining whether the transaction was a sale or a mortgage is the intention of the parties, and this is to be gathered not only from the instruments themselves, but from all the attending facts and circumstances. In *Peugh* v. *Davis*, 96 U. S. 332, the Supreme Court stated:

It is an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money. That court looks beyond the terms of the instrument to the real transaction; and when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties. As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible. The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. * * *

To the same effect are *Russell* v. *Southard*, 12 How. 138; *F. & R. Lazarus & Co.*, 32 B. T. A. 633; *First National Bank in Wichita*, 19 B. T. A. 744; affd., 57 Fed. (2d) 7; and *J. W. Solof*, 1 B. T. A. 776.

In *Russell* v. *Southard, supra,* the Supreme Court said, " in doubtful cases, the court leans to the conclusion that the reality was a mortgage and not a sale. [Citing cases.]" To the same effect is *F. & R. Lazarus & Co., supra.*

While the above cited cases deal with real property, it is equally true that a bill of sale of chattels, though absolute in form, may nevertheless constitute a mortgage. In *Sawyer* v. *Turpin*, 91 U. S. 114, a case involving a chattel interest, the Supreme Court stated in part:

The conveyance was by a bill of sale absolute in its terms, having no condition or defeasance expressed, but it was understood by the parties to be a security for the debt due. It was in substantial legal effect, though not in form, a mortgage.

See also *J. W. Solof, supra.*

The law of the State of Washington as to chattel mortgages is in accord with the principles above set forth. *Collins* v. *Denny Clay Co.*, 41 Wash. 136; 82 Pac. 1012; *Olsen* v. *Legal Adjustment Bureau*, 142 Wash. 432; 253 Pac. 643; and *Kenworthy Grain & Milling Co.* v. *Green Meadow Cheese Factory & Dairy Co.*, 171 Wash. 513; 18 Pac. (2d) 489. In the last cited case a bill of sale of cattle was absolute in form, but a letter was given at the same time; and the Supreme Court of Washington held that, considering the two instruments together, as it was necessary to do, the bill of sale was, in effect, and was intended to be, as between the parties, a chattel mortgage.

R. M. Drumheller, chairman of the board of directors of the petitioner, Ben B. Ehrlichman, president of the petitioner, and Odd O. Young, vice president of both the petitioner and the United Pacific Bond & Share Corporation, who signed the repurchase agreement on behalf of the latter corporation, each testified, in effect, that the purpose of the transaction was to effect a loan from the United Pacific Bond & Share Corporation to petitioner by way of a credit in favor of petitioner to be drawn against as and if needed. These were the individuals who, as representatives of the two corporations, discussed the matter of a loan and arrived at the agreement. Drumheller and Ehrlichman testified that it was the intention of the parties that under the repurchase agreement either party to the agreement should have the right to demand the repurchase of the securities by the petitioner. Young, who was vice president of both corporations, the only parties to the transactions, testified that it was not the intention to affect a sale of the securities.

Illustrative of the testimony upon the subject is the following testimony of Drumheller:

I suggested that the United National Corporation make a loan from the United Pacific Bond & Share Corporation. After some discussion the conversation disclosed there was some doubt as to whether or not the money would actually be required. The United National Corporation was expecting funds from other sources which might be received in time for calls for money that we had in mind; and as I recall it Mr. Ehrlichman suggested that under those circumstances it would be best not to borrow the money all at that time, but to arrange for a credit and to draw down money as the money was required and if it was required, and to accomplish that it was agreed that the money be borrowed on the basis of a repurchase agreement of the securities; that the sale be made in the form approximately as I recall it of $1,400,000 in securities and that the United National Corporation would then call for those bonds up to the $1,400,000 as the money was required, and that it was to be agreed as between the two corporations to the effect that the United National Corporation on demand from the United Pacific Bond & Share Corporation was to return the money and receive back the securities; and also, that upon demand on the United Pacific Bond & Share Company they would return back the securities and receive the money.

Bearing in mind that in doubtful cases a transaction of this sort should be deemed a mortgage rather than a sale, we are constrained to hold that the delivery of securities by petitioner to the United Pacific Bond & Share Corporation in the instant proceeding was intended to be and in reality was a mortgage and not a sale. The testimony of the witnesses, above referred to, was clear and convincing, the witnesses were not impeached, and their testimony is sufficient to overcome the presumption in favor of the correctness of the respondent's determination. There is no parol evidence whatsoever that the transaction constituted a sale. Furthermore, it is significant that the securities were redelivered to petitioner at the same figure at which they were previously delivered by petitioner to the United Pacific Bond & Share Corporation, despite the fact that the values of the securities were different on the two dates. It is also significant that the full value of the stock as agreed upon was never paid over to petitioner, notwithstanding that the United Pacific Bond & Share Corporation was in a position to turn over all of the money required and that contemporaneously other securities were actually sold and delivered. Too, the evidence shows that the buying and selling of stock is not the principal business of petitioner.

There is no proof to show whether or not the agreement was recorded. However, even if it were not, it would not be any the less effective as between the parties to it. As stated by the Supreme Court in *Dale* v. *Pattison*, 234 U. S. 399, 405, " There is no question that * * * a chattel mortgage, as well as a pledge, is valid between the parties, although not recorded." The law of the State of Washington is to the same effect. See *Heal* v. *Evans Creek Coal & Coke Co.*, 71 Wash. 225; 128 Pac. 211.

We have not overlooked the fact that the transaction was treated as a sale of securities on the books of the petitioner and that in its return for the taxable year in question the petitioner returned a profit as upon a sale. This, however, is not conclusive when considered in the light of the fact that the parties purposely put the transaction through in the *form* of a sale, issuing sales slips. The proof shows that when the officials of the petitioner, about five months after the due date for the filing of the return for the taxable year in question, became cognizant of the fact that a profit was shown, the profit was eliminated from the books at their direction and there was filed, about 10 months after such date of the return, a claim for refund of the taxes paid upon the reported profit upon the transaction. From the evidence we are satisfied and have found as a fact that the president of the petitioner, at the time he signed the return, did not know that a profit upon the transaction was being reported.

Nor have we overlooked the fact that the securities were delivered at their market or full value. This, in the absence of other evidence, would be of importance as tending to show that a sale was intended (*Russell* v. *Southard, supra*), but from the testimony we are satisfied that a loan was intended. To us it is not unreasonable to consider that the United Pacific Bond & Share Corporation would loan the full value of the securities in view of the fact that the petitioner's resources at the time were approximately $19,000,000 and the fact that the petitioner and the United Pacific Bond & Share Corporation were affiliated corporations.

Respondent also stresses the fact that there was no interest provided to be paid by the petitioner. We do not deem this controlling in the circumstances herein. The evidence shows that it was not contemplated that the petitioner would have to use the full amount of credit extended by the United Pacific Bond & Share Corporation, but that it desired the credit in the event it needed such credit. Actually, the petitioner used only a portion, $326,487, of the credit and that for only a short while. Furthermore, the petitioner and the United Pacific Bond & Share Corporation being closely related corporations, it is not significant that no interest was provided for. The failure to stipulate for interest is not conclusive. See *F. & R. Lazarus & Co., supra.*

Here the parties to the agreement, within two months after the securities had been delivered by petitioner to the United Pacific Bond & Share Corporation, mutually agreed that they should be redelivered to petitioner, since petitioner no longer needed the credit, and they were so redelivered within the taxable year in question. Thereafter, petitioner was in exactly the same position as it was before it transferred the securities to the United Pacific Bond & Share Corporation. The transaction as a whole actually resulted in no gain to petitioner.

The case of *Conway* v. *Alexander*, 7 Cranch, 218, relied upon by the respondent, is distinguishable. The distinction clearly appears from the following language of the Court:

> * * * The want of a covenant to repay the money is not complete evidence that a conditional sale was intended, but is a circumstance of no inconsiderable importance. * * *
>
> * * * It is certain, that this deed was not given to secure a pre-existing debt. The connection between the parties commenced with this transaction. The proof is also complete, that there was no negotiation between the parties respecting a loan of money; no proposition ever made respecting a mortgage. * * * No expression is proved to have ever fallen from Robert Alexander, before or after the transaction, respecting a loan or a mortgage. He does not appear to have imagined that money was to be so obtained; and when it became absolutely necessary to raise money, he seems to have considered the sale of property as his only resource.

To this circumstance, the court attaches much importance. Had there been any treaty—any conversation respecting a loan or a mortgage, the deed might have been, with more reason, considered as a cover intended to veil a transaction differing in reality from the appearance it assumed. But there was no such conversation. The parties met and treated upon the ground of sale and not of mortgage.

\*    \*    \*    \*    \*    \*    \*

In the instant proceeding several witnesses testified that there were negotiations between the parties respecting a loan of money and the parties treated upon the ground of mortgage and not of sale.

The other Supreme Court of the United States case cited by respondent, *Wallace* v. *Johnstone*, 129 U. S. 58, is also clearly distinguishable, as appears from the following statement of the court:

The evidence, as it appears in the record, is much less contradictory than is usual in such cases where it is sought by parol testimony to change an absolute conveyance, with a collateral agreement for a repurchase, into a mortgage.

With the single exception of the appellant, all the witnesses conversant with the negotiations between the parties unite in giving testimony tending to show that the transaction was a purchase of the lands by the appellee \* \* \*.

In the instant proceeding several witnesses, representing both parties to the transaction, gave testimony showing that the transaction was not a sale of the securities, but was a mortgage, and there is no parol evidence whatever that a sale was intended.

Respondent cites *Irving Fisher*, 30 B. T. A. 433, primarily for the principle that the burden is upon the petitioner to show that the transaction constituted a mortgage and not a sale not only because the respondent has officially determined it to be a sale, but also because it was expressly so designated in the contract of the parties thereto. We agree with the respondent that the burden of proof rests on the petitioner; and, in reaching our result herein, we have held the petitioner to his burden.

In that case as is in the instant proceeding parol evidence "*dehors* the contract" was received and considered upon the subject of whether transactions resulted in sales or loans. Obviously, if such evidence had been sufficient to establish a loan the result there would have been different; and the decision of each case must depend upon the facts and circumstances disclosed.

*Irving Fisher, supra,* is, in other respects, distinguishable. There the repurchase agreement was merely an option exercisable by the taxpayer. In the opinion in that case we stated that the right to reacquire "was entirely at his election" and that "There was \* \* \* no duty upon him to pay back any of the amount received \* \* \*." In the instant proceeding the United Pacific Bond & Share Corporation could demand that the petitioner take back the securities and repay the amount involved; and this was actually done. In that

case we pointed out in the opinion that none of the parties on the other side of the contract testified. In the instant proceeding Odd O. Young, vice president of both the petitioner and the United Pacific Bond & Share Corporation, who signed the repurchase agreement on behalf of the latter corporation, testified, as did other witnesses, that the purpose of the transaction was to effect a loan and that it was the intention of the parties to effect a sale of the securities. In the *Fisher* case we arrived at the conclusion, from the evidence, that when the taxpayer found that the terms amounted to an usurious contract he conscientiously and voluntarily gave up the idea of borrowing and worked out a plan of sale which would distribute the opportunity for profit between himself and the buyer, thereby avoiding the imputation of usury to the parties, whereas upon the undisputed evidence in the instant proceeding we are satisfied that the parties intended a mortgage and not a sale and that everything that occurred is reconcilable with the conclusion that a loan and not a sale resulted. In the *Fisher* case there was parol evidence which was wholly inconsistent with the view that a loan and not a sale was intended. Here borrowing by the taxpayer was necessary. The facts and circumstances there are in other respects quite different from those of the instant proceeding.

*Bank of California, National Association*, 30 B. T. A. 556, is distinguishable from the instant proceeding as well as from *First National Bank in Wichita*, *supra*.

Under all the facts and circumstances here presented none of the other cases cited by respondent permit, much less require, a holding different from that herein reached and hence are not controlling.

In arriving at our conclusion in this proceeding we have given no effect to any of the evidence offered to show that later, and in the succeeding taxable year, the petitioner entered into a similar transaction with the same corporation with respect to some of the same securities as are herein involved. We deem such evidence as to one isolated subsequent transaction immaterial. It is unnecessary for us to decide what effect evidence of this character showing a subsequent established course of dealing between the parties would have, since no offer of such proof was made.

Compare the following cases in which the courts and the Board have denied deductions on sales where the taxpayer did not intend to and did not finally dispose of his property, although going through the form of selling it, in some cases sales of stock being made through an exchange in the usual way: *Shoenberg* v. *Commissioner*, 77 Fed. (2d) 446, affirming *Sydney M. Shoenberg*, 30 B. T. A. 659; certiorari denied, 296 U. S. 586; *Rand Co.*, 29 B. T. A. 467; affd., 77 Fed. (2d) 450; *Dyer* v. *Commissioner*, 74 Fed. (2d) 685; certiorari

denied, 296 U. S. 586; *Esperson* v. *Commissioner*, 49 Fed. (2d) 259; affirming *Mrs. Niels (Mellie) Esperson, Executrix*, 13 B. T. A. 596; certiorari denied, 284 U. S. 658; *Joseph Blumenthal*, 30 B. T. A. 125; *Luella Hoyt Slayton*, 29 B. T. A. 931; affd., 76 Fed. (2d) 497; certiorari denied, 296 U. S. 586; *Mrs. J. B. Atkins*, 28 B. T. A. 500; petition to review denied, 76 Fed. (2d) 387; *James Brown*, 10 B. T. A. 1036; *J. R. Young*, 6 B. T. A. 656; *M. I. Stewart & Co.*, 2 B. T. A. 737; and *Harold B. Clark*, 2 B. T. A. 555.

The petitioner prays that the Board determine that the petitioner is entitled to a refund. The Board does not have jurisdiction to order a refund, but does have jurisdiction to determine whether petitioner has made an overpayment of tax for the year in question and to determine the amount of such overpayment. Sec. 322 (d), Revenue Act of 1934.[1] The recomputation will disclose whether there has been an overpayment of tax by the petitioner for the fiscal year ended June 30, 1930. As appears from our findings the tax shown to be due by the petitioner upon its return was paid within three years before the filing of the claim for refund, which was filed before the petition in the instant proceeding was filed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

STERNHAGEN and MELLOTT dissent.

---

[1](d) OVERPAYMENT FOUND BY BOARD.—If the Board finds that there is no deficiency and further finds that the taxpayer has made an overpayment of tax in respect of the taxable year in respect of which the Commissioner determined the deficiency, the Board shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Board has become final, be credited or refunded to the taxpayer. No such credit or refund/ shall be made of any portion of the tax unless the Board determines as part of its decision that it was paid within three years before the filing of the claim or the filing of the petition, whichever is earlier.