LIZZIE W. AND ALBERT L. CALLOWAY, PETITIONERS
*v*. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 8438–07.            Filed July 8, 2010.

In August 2001 P entered into an agreement with Derivium whereby P transferred 990 shares of IBM common stock to Derivium in exchange for $93,586.23. The terms of the agreement characterized the transaction as a loan of 90 percent of the value of the IBM stock pledged as collateral. The pur-

ported loan was nonrecourse and prohibited P from making any interest or principal payments during the 3-year term of the purported loan. The terms of the agreement allowed Derivium to sell the stock, which it did immediately upon receipt. At maturity P had the option of either paying the balance due and having an equivalent amount of IBM stock returned to him, renewing the purported loan for an additional term, or satisfying the "loan" by surrendering any right to receive IBM stock. At maturity in August 2004 the balance due was $40,924.57 more than the then value of the IBM stock. P elected to satisfy his purported loan by surrendering any right to receive IBM stock. P was not required to and did not make any payments toward either principal or interest on the purported loan.

1. *Held*: The transaction between P and Derivium in August 2001 was a sale. P transferred all the benefits and burdens of ownership of the stock to Derivium for $93,586.23 with no obligation to repay that amount.

2. *Held*, *further*, the transaction was not analogous to the securities lending arrangement in Rev. Rul. 57–451, 1957–2 C.B. 295, nor was it equivalent to a securities lending arrangement under sec. 1058, I.R.C.

3. *Held*, *further*, Ps are liable for an addition to tax under sec. 6651(a)(1), I.R.C., for the late filing of their 2001 Federal income tax return.

4. *Held*, *further*, Ps are liable for the accuracy-related penalty pursuant to sec. 6662, I.R.C.

*Brian G. Isaacson*, for petitioners.
*Daniel J. Parent*, for respondent.

RUWE, *Judge*: Respondent determined a $30,911 deficiency, a $6,583 addition to tax under section 6651(a)(1)[1] for failure to timely file, and a $6,182.20 accuracy-related penalty under section 6662(a) in regard to petitioners' 2001 Federal income tax. The issues we must decide are: (1) Whether a transaction in which Albert L. Calloway (petitioner) transferred 990 shares of International Business Machines Corp. (IBM) common stock to Derivium Capital, L.L.C. (Derivium), in exchange for $93,586.23 was a sale or a loan; (2) whether the transaction qualifies as a securities lending arrangement; (3) whether petitioners are liable for an addition to tax under section 6651(a)(1) for failure to timely file; and (4) whether

---

[1] All section references are to the Internal Revenue Code as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

petitioners are liable for an accuracy-related penalty pursuant to section 6662(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Georgia.

After petitioner graduated from college in 1964, he began a successful career with IBM. While employed at IBM petitioner purchased shares of IBM stock.

During 2001 petitioner's financial adviser, Bert Falls, introduced him to Derivium and its 90-percent-stock-loan program.[2] Under that program Derivium would purport to lend 90 percent of the value of securities pledged to Derivium as collateral. Derivium was not registered with the New York Stock Exchange or the National Association of Securities Dealers/Financial Industry Regulatory Authority. Charles D. Cathcart was president of Derivium.

On or about August 6, 2001, Derivium sent to petitioner a document entitled "Master Agreement to Provide Financing and Custodial Services" (master agreement) with attached "Schedule D, Disclosure Acknowledgement and Broker/Bank Indemnification" (schedule D). The master agreement provides, in pertinent part:

This Agreement is made for the purpose of engaging * * * [Derivium] to provide or arrange financing(s) and to provide custodial services to * * * [petitioner], with respect to certain properties and assets ("Properties") to be pledged as security, the details of which financing and Properties are to be set out in loan term sheets and attached hereto as Schedule(s) A ("Schedule(s) A").

The schedule D to be executed in connection with the master agreement states that the transaction was to "Provide Financing and Custodial Services entered into between Derivium * * * and * * * [petitioner]". Paragraph 3 of schedule D, relating to the pledge of securities, provides, in pertinent part:

---

[2] The use of the terms "loan", "collateral", "borrow", "lend", "hedge", and "maturity" with all related terms throughout this Opinion is merely for convenience in describing what petitioners contend the transaction represents.

[Petitioner] understands that by transferring securities as collateral to * * * [Derivium] and under the terms of the * * * [master agreement], * * * [petitioner] gives * * * [Derivium] the right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, *and/or sell outright some or all of the securities* during the period covered by the loan. * * * [Petitioner] understands that * * * [Derivium] has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan. * * * [Emphasis added.]

Derivium also sent to petitioner a document entitled "Schedule A–1, Property Description and Loan Terms" (schedule A–1), which sets forth the essential terms of the transaction. Schedule A–1 provides:

This Schedule A * * *, dated August 6th, 2001, is executed in connection with the Master Agreement to Provide Financing and Custodial Services entered into between Derivium * * * and [petitioner] * * * on 8/6/01.

| | | |
|---|---|---|
| 1. | Property Description: | 990 shares of International Business Machines Corporation (IBM). |
| 2. | Estimated Value: | $105,444.90 (as of 8/6/01, at $106.51 per share). |
| 3. | Anticipated Loan Amount: | 90% of the market value on closing, in part or in whole. |
| 4. | Interest Rate: | 10.50%, compounded annually, accruing until and due at maturity. |
| 5. | Cash vs. Accrual: | All Dividends will be received as cash payments against interest due, with the balance of interest owed to accrue until maturity date. |
| 6. | Term: | 3 years, starting from the date on which final loan proceeds are delivered on the loan transaction. |
| 7. | Amortization: | None. |
| 8. | Prepayment Penalty: | 3 year lockout, no prepayment before maturity. |
| 9. | Margin Requirements: | None, beyond initial collateral. |
| 10. | Non-Callable: | Lender cannot call loan before maturity. |
| 11. | Non-Recourse: | Non-recourse to borrower, recourse against the collateral only. |
| 12. | Renewable: | The loan may be renewed or refinanced at borrower's request for an additional term, on the maturity date, within * * * [Derivium's] prevailing conditions and terms for loans at the time of renewal or refinancing. On the renewal or refinancing of any loan for which 90% of the collateral value at maturity does not equal or exceed the payoff amount, there will be a renewal fee, which will be calculated as a percentage of the balance due at maturity of this loan. The percentage will vary according to the market capitalization of the securities at the time of the renewal or refinancing, as follows: Large Caps at 4.5%, Mid Caps at 5.5%, Small Caps at 6.5%. |

|     |          |                                         |
| --- | -------- | --------------------------------------- |
| 13. | Closing: | Upon receipt of securities and establishment of * * * [Derivium's] hedging transactions. |

Before entering into the agreement with Derivium, petitioner reviewed a memorandum dated December 12, 1998, from Robert J. Nagy, who claimed to be a certified public accountant, to Mr. Cathcart regarding the "Tax Aspects of First Security Capital's 90% Stock Loan" that was requested by Mr. Cathcart. In the memorandum Mr. Nagy describes a potential client as one who owns publicly traded stock with a low basis, which if sold would result in significant gain to the client. Mr. Nagy describes the primary issue as whether the 90-percent-stock-loan transaction is a sale or a loan and opines that, although there is no "absolute assurances that the desired tax treatment will be achieved", there is a "solid basis for the position that these transactions are, in fact, loans." Petitioner relied on Mr. Nagy's memorandum to Mr. Cathcart in deciding whether to enter into the agreement. Petitioner testified that a loan versus a sale transaction made economic sense to him because the loan proceeds given to him were 90 percent of the value of the IBM stock whereas if he had sold the stock he would have had to pay 20 percent for taxes.

Petitioner decided to enter into the 90-percent-stock-loan program (transaction) with Derivium. Petitioner signed the master agreement, the schedule D, and the schedule A–1 on August 8, 2001. Charles D. Cathcart, as president of Derivium, signed the master agreement and the schedule A–1 on August 10, 2001.

On or about August 9, 2001, petitioner instructed Brian J. Washington of First Union Securities, Inc., to transfer 990 shares of IBM common stock (IBM stock or collateral) to Morgan Keegan & Co. (Morgan Keegan) and to credit Derivium's account. On August 16, 2001, Morgan Keegan credited Derivium's account with the IBM stock transferred from petitioner. The following day, August 17, 2001, Derivium sold the 990 shares of IBM stock held in its Morgan Keegan account for $103,984.65 (i.e., $105.035 per share of IBM common stock). The net proceeds from Derivium's sale of the IBM stock were $103,918.18 (i.e., $103,984.65 minus a $3.47 "S.E.C. Fee" and a $63 "Commission"). On August 22, 2001, the net proceeds from the sale of the IBM stock settled into Derivium's Morgan Keegan account.

On or about August 17, 2001, Derivium's operations office sent to petitioner two documents. The first document, entitled "Valuation Confirmation", indicates that Derivium had received the IBM stock into its Morgan Keegan account valued at $104,692.50 (at a "Price per Share for Valuation" of $105.75). Thus, Derivium projected the amount it would lend to petitioner as $94,223.25. The second document, entitled "Activity Confirmation", however, indicates that as of August 17, 2001, Derivium had "hedged" the IBM stock for a "hedged value" of $103,984.70. [3] On the basis of the "hedged" value Derivium determined petitioner's actual "loan" amount as $93,586.23 (i.e., 90 percent of $103,984.70). Thus, the "loan" amount was not determined until after Derivium sold the IBM stock.

On August 21, 2001, Derivium sent to petitioner a letter informing him that the proceeds of the loan were sent to him according to the wire transfer instructions he had provided a few days earlier. On that same date, a $93,586.23 wire transfer was received and credited to petitioner's account at IBM Southeast Employees Federal Credit Union.

During the term of the "loan" Derivium provided petitioner with quarterly and yearend account statements. The quarterly account statements reported "end-of-quarter collateral value" and dividends such that it appeared that Derivium still held the IBM stock (i.e., Derivium appears to have reported the value of the collateral on the basis of the fair market value of the IBM stock at the end of each calendar quarter rather than the $103,984.65 of sale proceeds, and further reported dividends on the IBM stock, which it credited against the interest accrued during the quarter, as if it continued to hold all 990 shares of IBM stock). Petitioner neither received a Form 1099–DIV, Dividends and Distributions, nor included any IBM dividend income from the alleged dividends paid on the IBM stock on petitioners' 2001, 2002, 2003, or 2004 Federal income tax return.

In a letter dated July 8, 2004, Derivium informed petitioner that the loan "will mature on August 21, 2004" and

---

[3] Derivium's Morgan Keegan account statement reflects a sale price of $103,984.65 for the 990 shares of IBM common stock. The difference between Derivium's "hedged value" of $103,984.70 and the $103,984.65 reported on Derivium's Morgan Keegan account statement appears to be due to rounding. The Morgan Keegan statement reports the share price at the time of sale at $105.035, whereas Derivium's "Activity Confirmation" report indicates the share price at the time the shares were "hedged" at $105.03505.

that the "total principal and interest that will be due, and payable on the Maturity Date is $124,429.09". The letter also informed petitioner that, as of July 8, 2004, the value of 990 shares of IBM stock was $83,318.40. Derivium also reiterated to petitioner that, pursuant to the terms and conditions of the master agreement, he was entitled to elect one of the following three options at maturity: (1) "Pay the Maturity Amount and Recover Your Collateral"; (2) "Renew or Refinance the Transaction for an Additional Term"; or (3) "Surrender Your Collateral".

On July 27, 2004, petitioner responded to Derivium's July 8, 2004, letter, stating that "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation"; i.e., petitioner relinquished the right to acquire the IBM stock valued at $83,326.32[4] and never made any payments of principal or interest on the $124,250.89 balance due on the "loan".

On September 8, 2004, Derivium sent to petitioner a letter notifying him that the loan matured on August 21, 2004, and that the balance due was $40,924.57 more than the value of the IBM stock on the maturity date. The parties stipulate that the price per share of IBM stock was $105.03 on August 17, 2001, and approximately $84.16 on July 8, 2004.

On February 11, 2004, petitioners filed their 2001 joint Federal income tax return. Petitioners did not report the $93,586.23 received from Derivium in exchange for the IBM stock on their 2001 Federal income tax return, nor did they report the termination of the transaction with Derivium on their 2004 Federal income tax return.

Petitioner's cost basis in the 990 shares of IBM stock was $21,171.[5]

### OPINION

The primary issue is whether the transaction, in which petitioner transferred his IBM stock to Derivium and received $93,586.23, was a sale or a loan. Surprisingly, this case pre-

---

[4] The Sept. 8, 2004, letter indicates that the collateral, the IBM stock, was valued at $83,326.32 "using the average of the closing prices, as reported by the *Wall Street Journal*, for the ten trading days prior to the maturity date."

[5] In the notice of deficiency respondent's determination was made using a cost basis of $10,399 for petitioner's 990 shares of IBM stock.

sents an issue of first impression in this Court.[6] Nevertheless, there are many cases that provide us with guiding principles.

The master agreement between petitioner and Derivium refers to the transaction as a loan; however, "Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked." *United States v. Heller*, 866 F.2d 1336, 1341 (11th Cir. 1989); see also *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."); *Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (finding the economic substance of a transaction to be controlling and stating: "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.").

*Whether the Transaction Was a Sale of IBM Stock*

"The term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money." *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981) (citing *Commissioner v. Brown*, 380 U.S. 563, 570–571 (1965)). Since the economic substance of a transaction, rather than its form, controls for tax purposes, the key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership of the IBM stock passed from petitioner to Derivium. Whether the benefits and burdens of ownership have passed from one taxpayer to another is a question of fact that is determined from the intention of the parties as established by the written agreements read in the light of the attending facts and circumstances. See *Arevalo v. Commissioner*, 124 T.C. 244, 251–252 (2005), affd. 469 F.3d 436 (5th Cir. 2006). Factors

---

[6] There are now other cases pending in the Tax Court involving Derivium transactions. We understand that from 1998 to 2002 Derivium engaged in approximately 1,700 similar transactions involving approximately $1 billion. *Derivium Capital L.L.C. v. United States Trustee*, 97 AFTR 2d 2006–2582, at 2006–2583 to 2006–2584 (S.D.N.Y. 2006). The Government estimated the total tax loss associated with Derivium's scheme to be approximately $235 million. Complaint, *United States v. Cathcart*, No. 07–4762 (N.D. Cal. filed Sept. 17, 2007).

the courts have considered in making this determination include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest in the property is acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. See *id.* at 252; see also *Grodt & McKay Realty, Inc. v. Commissioner*, *supra* at 1237–1238.

Applying the above factors leads us to the conclusion that petitioner sold his IBM stock to Derivium in 2001.

(1) *Whether Legal Title Passed*

On August 16, 2001, petitioner transferred the IBM stock to Derivium's Morgan Keegan account. The master agreement provides that once Derivium received the IBM stock, Derivium was authorized to sell it without notice to petitioner. Derivium immediately sold the stock. Thus, legal title to the stock passed to Derivium in 2001 when petitioner transferred the IBM stock pursuant to the terms of the master agreement.[7]

(2) *The Parties' Treatment of the Transaction*

In the master agreement the parties characterize the transaction as a loan and characterize the IBM shares as collateral. However, on August 17, 2001, the day after it received the IBM stock, Derivium sold it. Derivium did not determine the value of the so-called loan to petitioner until after it had determined the proceeds it would receive from the sale of the IBM stock. Although petitioner testified that he did not know Derivium had sold the IBM stock and that he believed Derivium was only acting as a custodian of the stock, petitioner admitted that when he signed the agreement he knew that he had authorized Derivium to sell the

---

[7] Legal title is one of several factors in our test and may not be determinative in every situation; e.g., brokers holding stock for the accounts of customers or as security for advances under highly regulated conditions. See *Provost v. United States*, 269 U.S. 443 (1926). Indeed, Congress has provided that certain types of security lending arrangements do not have to be recognized as taxable transactions if they meet the strict requirements of sec. 1058. See *infra* pp. 42–45.

stock.[8] Petitioners did not report dividends paid on the IBM stock on their 2001, 2002, 2003, or 2004 Federal income tax return, and petitioner was never required to repay any of the principal or interest on the "loan". Indeed, even though petitioners argue that the "sale" of their IBM stock occurred in 2004, they failed to report the "sale" of their IBM shares on their 2004 Federal income tax return. They also failed to alternatively report any relief of indebtedness income from the transaction on their 2004 return. In short, petitioners did not treat this transaction in a manner consistent with their own characterization of the transaction.

### (3) *Equity Inherent in the Stock*

Derivium acquired all property interests in the IBM stock, and the next day all of Derivium's interest in the stock was sold. Petitioner retained no property interest in the stock. At best he had an option to purchase an equivalent number of IBM shares after 3 years at a price equivalent to $93,586.23 plus "interest". The effectiveness of the option depended on Derivium's ability to acquire and deliver the required number of IBM shares in 2004.

### (4) *Obligation To Deliver and Pay*

The master agreement obligates petitioner to transfer the IBM stock to Derivium and Derivium to pay 90 percent of the fair market value of the stock. The amount Derivium had to pay was determined after Derivium sold the IBM stock.

---

[8] At trial petitioner testified:

Q   What responsibilities do you believe that Derivium, let's call it DC, Derivium Capital, had to you?
A   They had a responsibility of protecting me throughout that three-year period to ensure that the stock was there at the completion of the transaction.
Q   Would this enable you to the return of your IBM shares?
A   That would enable me to buy back my shares, yes.

          *       *       *       *       *       *       *

Q   Had they sold the shares, what percentage would you have received?
A   Had they sold? Well, they had the right to sell it.
Q   Wait, wait, hold on a second. Let's give him a chance to—are we ready? Okay.
A   I would not have received anything because they had the right, that was something that I agreed to, but they also had the responsibility as a custodian to return to me the total number of 990 shares at the completion of the transaction.

(5) *Whether the Right of Possession Passed*

Derivium obtained title to, possession of, and complete control of the IBM stock from petitioner. Derivium immediately exercised those rights and sold the stock.

(6) *Payment of Property Taxes*

This factor is inapplicable under the facts of this case.

(7) *The Risk of Loss or Damage*

Upon receipt of the $93,586.23 from Derivium in 2001, petitioner bore no risk of loss in the event that the value of the IBM stock decreased. Petitioner was entitled to retain all the funds transferred to him regardless of the performance of the IBM stock in the financial marketplace.

(8) *Profits From the Property*

The master agreement provides:

[Petitioner] gives * * * [Derivium] the right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan. * * * [Petitioner] understands that * * * [Derivium] has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan. * * *

At best the master agreement gave petitioner an option to repurchase IBM stock from Derivium at the end of the 3 years;[9] however, this option depended on Derivium's ability to acquire IBM stock in 2004. The foregoing factors indicate that the transaction was a sale of IBM stock in 2001.

In the context of taxation, courts have defined a loan as "'an agreement, either express or implied, whereby one person advances money to the other and the other agrees to

---

[9] Petitioner testified that he had an option to reacquire 990 shares of IBM stock by paying the balance due in 2004, but he did not exercise that option:

A  I had three options as indicated in the documentation. The option I chose was to relinquish the shares in 2004.

Q  So there was no requirement that you had to repay the loan?

A  There was a choice. I could have extended the loan, I could have relinquished the loan, but the loan was upside down. There was a debt of $40,000. I chose to relinquish the shares. That was in payment for the loan becoming a taxable event in 2004.

As previously mentioned, petitioners failed to report a sale of the IBM stock on their 2004 Federal income tax return.

repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree.'" *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962)), affg. T.C. Memo. 1998–121; see also *Talmage v. Commissioner*, T.C. Memo. 2008–34. For a transaction to be a bona fide loan the parties must have actually intended to establish a debtor-creditor relationship at the time the funds were advanced. *Fisher v. Commissioner*, 54 T.C. 905, 909–910 (1970). "Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts in the case." *Id.* at 909. "For disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment." *Haag v. Commissioner*, 88 T.C. 604, 615–616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).

Courts have considered various factors in determining whether a transfer constitutes genuine indebtedness. No one factor is necessarily determinative, and the factors considered do not constitute an exclusive list. See *Ellinger v. United States*, 470 F.3d 1325, 1333–1334 (11th Cir. 2006) (listing a nonexclusive list of 13 factors); *Welch v. Commissioner*, *supra* at 1230.[10] Often it comes down to a question of substance over form requiring courts to "'look beyond the parties' terminology to the substance and economic realities'". *BB&T Corp. v. United States*, 523 F.3d 461, 476 (4th Cir. 2008) (quoting *Halle v. Commissioner*, 83 F.3d 649, 655 (4th Cir. 1996), revg. *Kingstowne L.P. v. Commissioner*, T.C. Memo. 1994–630). Our analysis of the factors relevant to this case leads to the conclusion that even though the documents prepared by Derivium use the term "loan", the transaction lacked the characteristics of a true loan.

---

[10] For example the nonexclusive list of factors enumerated in *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), are: (1) Whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

The transaction was structured so that petitioner could receive 90 percent of the value of his IBM stock. Petitioner would have no personal liability to pay principal or interest to Derivium, and it would have made no sense to do so unless the value of the stock had substantially appreciated. Petitioner transferred ownership of the stock to Derivium, which received all rights and privileges of ownership and was free to sell the stock. Derivium did immediately sell the stock and immediately passed 90 percent of the proceeds to petitioner. The only right petitioner retained regarding shares of IBM stock was an option, exercisable 3 years later, in 2004, to require Derivium to acquire 990 shares of IBM stock and deliver them to him in 2004. Petitioner's right to exercise this option in 2004 was wholly contractual because he had already transferred all of the incidents of ownership to Derivium, which had immediately sold the 990 shares.[11] See *Provost v. United States*, 269 U.S. 443 (1926). Petitioner engaged in the transaction because he thought that the "loan" characterization would allow him to realize 90 percent of the value of the stock, whereas a "sale" would have netted only 80 percent of the stock's value after payment of tax on the gain. After the transfer petitioners did not conduct themselves as if the transaction was a loan. Petitioners did not report dividends earned on the 990 shares of IBM stock on their Federal income tax returns. When petitioners decided not to "repay the loan" in 2004, they did not report a sale of the stock on their 2004 Federal income tax return and failed to report any discharge of indebtedness income. This failure was totally inconsistent with petitioners' "loan" characterization.

As to Derivium, immediately upon its receipt of petitioner's stock, it sold the stock in order to fund the "loan". It did not hold the stock as collateral for a loan. In an ordinary lending

---

[11] In some instances Derivium's clients have requested the return of stock. The parties stipulated that Derivium's failure to return the stock has resulted in a number of lawsuits; e.g., *The Lee Family Trust v. Derivium Capital L.L.C.*, U.S. District Court, District of South Carolina, *Robert G. Sabelhaus v. Derivium Capital*, U.S. District Court, District of South Carolina, *The Hammond Family 1994, L.P. v. Diversified Design*, U.S. District Court, District of South Carolina, *Newton Family L.L.C. v. Derivium Capital*, U.S. District Court, District of Wyoming, *WCN/GAN Partners, Ltd. v. Charles Cathcart*, U.S. District Court, District of Wyoming, *Derivium Capital L.L.C. v. General Holdings Inc.*, U.S. District Court, District of South Carolina, *Grayson v. Cathcart*, U.S. District Court, District of South Carolina. On Sept. 1, 2005, Derivium filed a ch. 11 bankruptcy petition, and on Nov. 4, 2005, the case was converted to ch. 7 and venue was moved to South Carolina.

transaction the risk of loss to a lender is that the borrower might not repay the loan. In contrast to the ordinary risk assumed by a lender, Derivium's only risk of loss would have arisen if petitioner had actually repaid the "loan". Petitioner would very likely have exercised his option to "repay the loan" if the value of the 990 shares of IBM stock, in August 2004, had exceeded the balance due. However, if petitioner had exercised his option under those circumstances, Derivium would have been required to acquire 990 shares of IBM stock at a cost exceeding the amount it would have received from petitioner. On the basis of all of these factors we must conclude that Derivium did not expect or want the "loan" to be repaid. Of course if the value of the IBM stock had been less than the "loan" balance in 2004, it would have been foolish for petitioner to pay the "loan" balance. As petitioner explained at trial, he did not exercise his right to "buy back my shares" because it would have cost more than the shares were worth.

We hold that the transaction was not a loan and that petitioner sold his IBM stock for $93,586.23 in 2001. [12]

This case presents an issue of first impression in this Court. However, two other Federal courts have recently considered whether the transfer of securities to Derivium under its 90-percent-stock-loan program was a sale for Federal tax purposes. In each of those cases the court, using essentially the same facts and applying the same legal standards that are found in cases such as *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1237–1238, and *Welch v. Commissioner*, 204 F.3d at 1230, found that the 90-percent-stock-loan-program transactions were sales of securities and not bona fide loans. See *Nagy v. United States*, 104 AFTR 2d 2009–7789, 2010–1 USTC par. 50,177 (D.S.C. 2009) (in an action involving section 6700 promoter penalties, Chief Judge Norton for the U.S. District Court for the District of South Carolina granted the Government's motion for partial summary judgment, holding that the 90-percent-stock-loan-program transactions offered by Derivium were sales of securi-

_____

[12] As noted by the U.S. Court of Appeals for the Fourth Circuit when it rejected the taxpayer's argument that it had incurred a debt because the arrangement was labeled a "loan": "In closing, we are reminded of 'Abe Lincoln's riddle ... "How many legs does a dog have if you call a tail a leg?"'" *Rogers v. United States*, 281 F.3d 1108, 1118 (10th Cir. 2002). 'The answer is "four," because "calling a tail a leg does not make it one."' *Id.*" *BB&T Corp. v. United States*, 523 F.3d 461, 477 (4th Cir. 2008).

ties, not bona fide loans); *United States v. Cathcart*, 104 AFTR 2d 2009–6625, 2009–2 USTC par. 50,658 (N.D. Cal. 2009) (in an action to enjoin defendants from continuing to promote Derivium's 90-percent-stock-loan program, Judge Hamilton of the U.S. District Court for the Northern District of California granted the Government's motion for partial summary judgment, holding that the 90-percent-stock-loan-program transactions offered by Derivium were sales of securities, not bona fide loans). Subsequently, the District Court for the Northern District of California permanently enjoined Charles Cathcart from, directly or indirectly, by use of any means or instrumentalities:

1. Organizing, promoting, marketing, selling, or implementing the "90% Loan" program that is the subject of the complaint herein;

2. Organizing, promoting, marketing, selling, or implementing any program, plan or arrangement similar to the 90% Loan program that purports to enable customers to receive valuable consideration in exchange for stocks and other securities that are transferred or pledged by those customers, without the need to pay tax on any gains because the transaction is characterized as a loan rather than a sale;

[*United States v. Cathcart*, No. 4:07–CV–04762–PJH (N.D. Cal. Nov. 23, 2009).]

We note that Mr. Cathcart stipulated to the entry of this permanent injunction.

With respect to Derivium, a magistrate judge for the District Court for the Northern District of California recommended that "injunctive relief against Derivium is 'necessary or appropriate for the enforcement of the Internal Revenue laws.'" *United States v. Cathcart*, 105 AFTR 2d 2010–1287, at 2010–1292 (N.D. Cal. 2010). District Court Judge Hamilton adopted the magistrate judge's recommendations, finding that the report was well reasoned and thorough in every respect. *United States v. Cathcart*, 105 AFTR 2d 2010–1293 (N.D. Cal. 2010). [13]

---

[13] The report and recommendation of the magistrate judge, which was adopted by the District Court judge, stated:

Section 7408 authorizes a court to enjoin persons who have engaged in any conduct subject to penalty under § 6700 if the court finds that injunctive relief is appropriate to prevent the recurrence of such conduct. * * *

\* \* \* \* \* \* \* \*

To establish a violation of § 6700 warranting an injunction under § 7408, the government must prove that defendant: (1) organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) knew or had

reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct. *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000) citing I.R.C. §§ 6700(a), 7408(b). "Under § 6700, any 'plan or arrangement' having some connection to taxes can serve as a 'tax shelter' and will be an 'abusive' tax shelter if the defendant makes the requisite false or fraudulent statements concerning the tax benefits of participation." *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000). "Congress designed section 6700 as a 'penalty provision specifically directed toward promoters of abusive tax shelters *and other abusive tax avoidance schemes.*'" *United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985) (emphasis in original). * * *

\* \* \* \* \* \* \*

In an order dated September 22, 2009, the district court granted in part and denied in part, Defendants' motions for summary judgment. The court found that the undisputed evidence revealed that[4]: as part of the loan transaction in question, legal title of a customer's securities transfers to Derivium USA (for example) during the purported loan term in question, which vests possession of the shares in Derivium's hands for the duration of the purported loan term; that the customer must transfer 100% of all shares of securities to Derivium USA and that once transferred, Derivium USA sells those shares on the open market, and that once sold, Derivium USA transfers 90% of that sale amount to the customer as the "loan" amount, keeping 10% in Derivium USA's hands; that during the term of the loan, the Master Loan Agreement provides that Derivium USA has the right to receive all benefits that come from disposition of the customer's securities, and that the customer is not entitled to these benefits; that the customer is furthermore prohibited from repaying the loan amount prior to maturity and is not required to pay any interest before the loan maturity date; and that, at the end of the purported loan term, the customer is not required to repay the amount of the loan (but merely allowed to do so as one option at the loan's maturity date) and can exercise the option to walk away from the loan entirely at the maturity date without repaying the principle; and thus, can conceivably walk away from the transaction without paying interest at all on the loan.

[4]The following factual findings are taken directly from Judge Hamilton's Order dated September 22, 2009. Docket No. 333.

The district court concluded that analysis of these and other undisputed facts pursuant to either the benefits/burdens approach outlined in *Grodt & McKay Realty, Inc. v. Commissioner of Internal Revenue*, 77 T.C. 1221, 1236 (Tax Court 1981), or the approach outlined in *Welch v. Comm'r*, 204 F.3d 1228, 1230 (9th Cir. 2000), compelled the conclusion that the transactions in question constituted sales of securities, rather than bona fide loan transactions. *See e.g.*, *Grodt*, 77 T.C. at 1236–37 (applying multi-factor test to determine point at which the burdens and benefits of ownership are transferred for purposes of qualifying a transaction as a sale); *Welch*, 204 F.3d at 1230 (examining factors necessary to determine whether a transaction constitutes a bona fide loan).

The district court also found that the "substance over form doctrine" further supported the conclusion that, in looking beyond the actual language of the Master Loan Agreement to the totality of the undisputed facts, the substance of the transaction between the parties constituted a sale, and not a bona fide loan. *See*, *e.g.*, *Harbor Bancorp and Subsidiaries v. Comm'r*, 115 F.3d 722, 729 (9th Cir. 1997) (it is axiomatic that tax law follows substance and not form).

\* \* \* \* \* \* \*

Reviewing the above evidence and legal authorities cited above, the Court concludes that the evidence against Defendant Derivium USA is strong and that the merits of the case support entry of default judgment here. The Court concludes that an injunction against Derivium is necessary or appropriate for the enforcement of the internal revenue laws. *See e.g.*, *United States v. Thompson*, 395 F.Supp.2d 941, 945–46 (E.D. Cal. 2005) ("Injunctive relief is appropriate if the defendant is reasonably likely to violate the federal tax laws again.")

[*United States v. Cathcart*, 105 AFTR 2d 2010–1287, at 2010–1290 to 2010–1291 (N.D. Cal. 2010).]

*Securities Lending Arrangement*

On brief petitioners argue that the transaction was a nontaxable securities lending arrangement analogous to the following situation described in Rev. Rul. 57–451, 1957–2 C.B. 295, 296:

(2) The stockholder deposits his stock with his broker in a "safekeeping" account and, at the time of deposit, endorses the stock certificates and then authorizes the broker to "lend" such certificates in the ordinary course of the broker's business to other customers of the broker. The broker has the certificates cancelled and new ones reissued in his own name.

In Rev. Rul. 57–451, *supra*, the Internal Revenue Service was asked to determine whether the situation described above was a taxable disposition of stock by the stockholder. Petitioners urge this comparison because the revenue ruling concludes that there is no taxable disposition of stock unless and until the broker satisfies his obligation to the stockholder by delivering property that does not meet the requirements of section 1036. Section 1036 provides for nonrecognition if common stock in a corporation is exchanged solely for common stock in the same corporation. *Id.*, 1957–2 C.B. at 298. By analogy, petitioner seems to argue that his IBM stock was not disposed of until 2004 when he surrendered his right to reacquire the IBM stock in satisfaction of his "debt" to Derivium.

The transaction differs significantly from that described in the revenue ruling. Derivium was not acting as a broker, and the arrangement between petitioner and Derivium was not the type of securities lending arrangement described in the revenue ruling. In the revenue ruling, the stockholder authorized his broker, subject at all times to the instructions of the stockholder, to "lend" his stock to others to satisfy obligations in a short sale transaction. The "loan" in the revenue ruling required the borrower, "on demand," to restore the lender to the same economic position that he had occupied before entering into the "loan". Rev. Rul. 57–451, 1957–2 C.B. at 297, described the transaction as follows:

In such a case, all of the incidents of ownership in the stock and not mere legal title, pass to the "borrowing" customer from the "lending" broker. For such incidents of ownership, the "lending" broker has substituted the personal obligation, wholly contractual, of the "borrowing" customer to restore

him, on demand, to the economic position in which he would have been as owner of the stock, had the "loan" transaction not been entered into. See *Provost v. United States*, 269 U.S. 443 * * * (1926). * * *

The securities lending arrangement described in *Provost* was also terminable on demand by either the lender or the borrower so that the lender retained all the benefits and assumed all of the burdens incident to ownership of the stock. [14]

The master agreement did not enable petitioner to retain all of the benefits and burdens of being the owner of the IBM stock. Neither petitioner nor Derivium could terminate the "loan" on demand. Petitioner could not repay the "loan" and demand return of his stock during the 3-year term of the "loan". As a result, petitioner did not retain the benefits and burdens of ownership. He did not retain the benefit of being able to sell his interest in the stock at any time during the 3-year period and, therefore, could not take advantage of any increases in the stock's value at any given time during the 3-year period. At the same time petitioner bore no risk of loss in the event that the stock's value decreased.

In 1978 Congress codified and clarified the then-existing law represented by Rev. Rul. 57–451, *supra*, by enacting section 1058. Section 1058(a) provides for nonrecognition of gain or loss when securities are transferred under certain agreements as follows:

In the case of a taxpayer who transfers securities * * * pursuant to an agreement which meets the requirements of subsection (b), no gain or loss shall be recognized on the exchange of such securities by the taxpayer for an obligation under such agreement, or on the exchange of rights under such agreement by that taxpayer for securities identical to the securities transferred by that taxpayer.

---

[14] In *Provost v. United States*, 269 U.S. at 452, the Supreme Court described the transaction as follows:

During the continuance of the loan the borrowing broker is bound by the loan contract to give the lender all the benefits and the lender is bound to assume all the burdens incident to ownership of the stock which is the subject of the transaction, as though the lender had retained the stock. The borrower must accordingly credit the lender with the amount of any dividends paid upon the stock while the loan continues and the lender must assume or pay to the borrower the amount of any assessments upon the stock. * * *

The original short sale is thus completed and there remains only the obligation of the borrowing broker, terminable on demand, either by the borrower or the lender, to return the stock borrowed on repayment to him of his cash deposit, and the obligation of the lender to repay the deposit, with interest as agreed. * * *

Section 1058(b) requires the securities agreement to meet the following four requirements in order to qualify for non-recognition:

SEC. 1058(b). AGREEMENT REQUIREMENTS.—In order to meet the requirements of this subsection, an agreement shall—

(1) provide for the return to the transferor of securities identical to the securities transferred;

(2) require that payments shall be made to the transferor of amounts equivalent to all interest, dividends, and other distributions which the owner of the securities is entitled to receive during the period beginning with the transfer of the securities by the transferor and ending with the transfer of identical securities back to the transferor;

(3) not reduce the risk of loss or opportunity for gain of the transferor of the securities in the securities transferred; and

(4) meet such other requirements as the Secretary may by regulation prescribe.

The master agreement does not satisfy the requirements of section 1058(b)(3).

In order to meet the requirements of section 1058(b)(3), the agreement must give the person who transfers stock "all of the benefits and burdens of ownership of the transferred securities" and the right to "be able to terminate the loan agreement upon demand." *Samueli v. Commissioner*, 132 T.C. 37, 51 (2009). In *Samueli* we focused on the meaning of the requirement in section 1058(b)(3).

[W]e read the relevant requirement * * * to measure a taxpayer's opportunity for gain as of each day during the loan period. A taxpayer has such an opportunity for gain as to a security only if the taxpayer is able to effect a sale of the security in the ordinary course of the relevant market (e.g., by calling a broker to place a sale) whenever the security is in-the-money. A significant impediment to the taxpayer's ability to effect such a sale * * * is a reduction in a taxpayer's opportunity for gain. [*Id.* at 48.]

Petitioner was bereft of any opportunity for gain during the 3-year period because he could reacquire the IBM stock only at maturity. Schedule D of the master agreement not only provides that Derivium had the "right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan", but also provides that Derivium "has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the

term of a loan." Because petitioner was prohibited from demanding a return of any stock during the 3-year period, his opportunity for gain was severely diminished. See *Samueli v. Commissioner*, *supra* at 48. Accordingly, we hold that the transaction is not analogous to the second situation in Rev. Rul. 57–451, *supra*, and is not an arrangement that meets the requirements of section 1058.

*Addition to Tax Under Section 6651(a)(1)*

Section 6651(a)(1) provides for an addition to tax where a failure to timely file a Federal tax return is not due to reasonable cause or is due to willful neglect. Pursuant to section 7491(c), the Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).

Petitioners filed their 2001 Federal income tax return on February 11, 2004, more than 21 months after its due date. Therefore, respondent has met his burden of production under section 7491(c); and in order to avoid the section 6651(a)(1) addition to tax, petitioners have the burden of establishing reasonable cause and the absence of willful neglect for failure to timely file. See *Natkunanathan v. Commissioner*, T.C. Memo. 2010–15.

A delay in filing a Federal tax return is due to reasonable cause "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time". Sec. 301.6651–1(c)(1), Proced. & Admin. Regs. The Supreme Court has said that willful neglect, in this context, means "a conscious, intentional failure or reckless indifference." *United States v. Boyle*, 469 U.S. 241, 245 (1985).

The only explanation petitioners offered for the delay in filing their 2001 Federal income tax return was that they reported on their 2001 Federal income tax return that they "paid $25,150 in taxes," and that "without recharacterizing the loan as a sale * * * [they] would have been entitled to a refund of $3,979." Petitioners' explanation establishes neither reasonable cause nor the absence of willful neglect. Accordingly, we sustain respondent's determination and hold

petitioners liable for the addition to tax pursuant to section 6651(a)(1).

*Accuracy-Related Penalty Under Section 6662(a)*

Section 6662(a) and (b)(1) and (2) provides that a taxpayer is liable for a 20-percent accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return attributable to, inter alia, (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. See *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. 161, 189–191 (2009). The Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof. Sec. 7491(c); *Higbee v. Commissioner*, *supra* at 446.

A substantial understatement of income tax is defined as the greater of "10 percent of the tax required to be shown on the return for the taxable year," or "$5,000." Sec. 6662(d)(1)(A). Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title", and disregard includes "any careless, reckless, or intentional disregard." Sec. 6662(c).

Respondent has met his burden of production by establishing that petitioner sold his IBM stock in 2001 and failed to report the capital gain. Petitioners' failure to report the gain from the sale of the IBM stock in 2001 results in a substantial understatement of income tax because the resultant understatement exceeds $5,000 and is more than 10 percent of the correct tax.

The penalty under section 6662(a) shall not be imposed upon any portion of an underpayment where the taxpayer shows that he acted with reasonable cause and in good faith with respect to such portion. See sec. 6664(c)(1); *Higbee v. Commissioner*, *supra* at 448. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. *Higbee v. Commissioner*, *supra* at 448; sec. 1.6664–4(b)(1), Income Tax Regs.

As previously noted, petitioners did not report their annual dividends from their IBM stock which were, under their version of the transaction, credited yearly against their interest due to Derivium. A payment of the dividends

by IBM, under their version of the transaction, would have created taxable income to them. Further, in 2004 they did not report the sale of their IBM stock or any gain from that transaction, nor did they report any relief of indebtedness income. These failures were inconsistent with petitioners' version of the transaction.

"Under some circumstances, a taxpayer may avoid liability for the accuracy-related penalty by showing reasonable reliance on a competent professional adviser." *Tigers Eye Trading, L.L.C. v. Commissioner*, T.C. Memo. 2009–121 (citing *United States v. Boyle*, *supra* at 250–251, and *Freytag v. Commissioner*, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991)). For reliance on professional advice to excuse a taxpayer from the accuracy-related penalty, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. See *David v. Commissioner*, 43 F.3d 788, 789–790 (2d Cir. 1995), affg. T.C. Memo. 1993–621; *Freytag v. Commissioner*, *supra* at 888; *Tigers Eye Trading, L.L.C. v. Commissioner*, *supra*. "The validity of the reliance turns on 'the quality and objectivity of professional advice which they obtained'." *Tigers Eye Trading, L.L.C. v. Commissioner*, *supra* (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986)).

To be reasonable, professional tax advice must generally be from a competent and independent adviser unburdened with a conflict of interest and not from promoters of the investment. *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004–279. "Courts have routinely held that taxpayers could not reasonably rely on the advice of promoters or other advisers with an inherent conflict of interest such as one who financially benefits from the transaction." *Tigers Eye Trading, L.L.C. v. Commissioner*, *supra* (citing *Hansen v. Commissioner*, 471 F.3d 1021, 1031 (9th Cir. 2006) ("a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest"), affg. T.C. Memo. 2004–269, *Van Scoten v. Commissioner*, 439 F.3d 1243, 1253 (10th Cir. 2006) ("To be reasonable, the professional adviser cannot be directly affiliated with the promoter; instead, he must be more independent"), affg. T.C. Memo.

2004–275, *Barlow v. Commissioner*, 301 F.3d 714, 723 (6th Cir. 2002) (noting "that courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity"), affg. T.C. Memo. 2000–339, *Goldman v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994) (taxpayer could not reasonably rely on professional advice of someone known to be burdened with an inherent conflict of interest—a sales representative of the transaction), affg. T.C. Memo. 1993–480, *Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993) (reliance on promoters or their agents is unreasonable because such persons are not independent of the investment), affg. *Donahue v. Commissioner*, T.C. Memo. 1991–181, and *Illes v. Commissioner*, 982 F.2d 163, 166 (6th Cir. 1992) (finding negligence where taxpayer relied on person with financial interest in the venture), affg. T.C. Memo. 1991–449). "A promoter's self-interest makes such 'advice' inherently unreliable." *Id.*

At trial petitioner testified that he relied on the advice of his financial adviser, Mr. Falls, in deciding to enter into the transaction. However, petitioners have not made any effort to establish Mr. Falls' credentials or qualifications as a financial or tax adviser, nor have they established what relationship Mr. Falls had with Derivium, if any.

Petitioner also testified that he relied upon his accountant Sharon Cooper as a tax adviser. Ms. Cooper was not called as a witness. Petitioner testified that Ms. Cooper provided him with the memorandum dated December 12, 1998, from Robert J. Nagy to Charles D. Cathcart regarding "Tax Aspects of First Security Capital's 90% Stock Loan". Mr. Cathcart was also Derivium's president.[15] In the 1998 memorandum Mr. Nagy opines that First Security Capital's 90-percent-stock-loan program was designed to create genuine indebtedness for Federal tax purposes. Petitioner testified that he knew nothing about Mr. Nagy other than that he apparently wrote the 1998 opinion letter addressed to Mr. Cathcart concerning another 90-percent-stock-loan transaction. In the light of the previously cited cases, we find that petitioners have failed to establish reasonable reliance upon

[15] See *supra* pp. 39–40 regarding *Nagy v. United States*, 104 AFTR 2d 2009–7789, 2010–1 USTC par. 50,177 (D.S.C. 2009).

a competent professional adviser. Accordingly, we sustain respondent's determination to impose an accuracy-related penalty under section 6662(a).

In reaching our holdings herein, we have considered all arguments made and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

COLVIN, COHEN, WELLS, GALE, THORNTON, MARVEL, GOEKE, KROUPA, GUSTAFSON, and PARIS, *JJ.*, agree with this majority opinion.

MORRISON, *J.*, did not participate in the consideration of this opinion.

———————————

HALPERN, *J.*, concurring in the result only:

Putting aside the addition to tax and penalty, we must answer two questions. First, did petitioner dispose of his IBM common stock in 2001 by transferring it to Derivium? Second, if he did, did the transaction nevertheless remain open for income tax purposes until 2004 when petitioner decided whether to demand that Derivium return stock identical to the transferred stock, so as to invoke the nonrecognition rule of section 1036?[1] I answer the first question in the affirmative and the second in the negative, as does the majority; our reasons differ, however, particularly with respect to the first question.

Shares of stock of the same class are fungible, and this has given rise to apparently formalistic rules for determining questions of ownership (and, by extension, disposition) of such shares. The traditional, multifactor, economic risk-reward analysis, as argued by the parties, is appropriate for determining tax ownership of nonfungible assets, such as cattle. See *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). For fungible securities, however, a more focused inquiry—whether legal title to the assets and

———————————

[1] Sec. 1036(a) provides: "General Rule.—No gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation."

the power to dispose of them are joined in the supposed owner—has been determinative of ownership for more than 100 years.

In *Richardson v. Shaw*, 209 U.S. 365 (1908), a nontax case, a stockbroker, who held title to the securities in a customer's margin account, had pledged those securities to secure a loan. The broker then filed for bankruptcy. The question before the Court was whether, despite the pledge and the broker's authority to cover its obligation to its customer with securities other than those actually purchased on the customer's behalf, the customer was the owner of the securities and so, on the broker's bankruptcy, did not become merely a creditor of the bankrupt. Focusing on the fungibility of the securities in question and the broker's limited authority to pledge them (and not to sell them except in limited circumstances), the Court concluded that the broker's status was essentially that of a pledgee and that the customer was and remained the owner of the securities. Legal title and the power to dispose were not united in the broker, and the broker was not, therefore, the owner of the securities.

In *Provost v. United States*, 269 U.S. 443 (1926), a Federal stamp tax case, the question was whether the transfers of stock back and forth between a securities lender and a securities borrower (both stockbrokers) constituted taxable dispositions of the stock. The Court assumed that such transfers usually occurred to facilitate short sales. The securities lender provided the stock to the securities borrower, who delivered it in fulfillment of the agreement of his customer (who was short the stock) to sell it. The lender had the contractual right, on demand (with notice), to receive equivalent stock from the borrower. The Supreme Court sharply distinguished the facts in *Provost* from those in *Richardson v. Shaw*, *supra*. In *Richardson*, the broker's status as pledgee rather than owner rested on the requirement that the broker have on hand for delivery to its customers stock of the kind and amount that the customers owned. In a securities loan, however:

The procedure adopted and the obligations incurred in effecting a loan of stock and its delivery upon a short sale neither contemplate nor admit of the retention by * * * the lender of any of the incidents of ownership in the stock loaned. * * * Upon the physical delivery of the certificates of stock by the lender, with the full recognition of the right and authority

of the borrower to appropriate them to his short sale contract, and their receipt by the purchaser, all the incidents of ownership in the stock pass to him. [*Provost v. United States*, *supra* at 455–456.]

Notwithstanding that the securities lender retained full market risk on the stock lent, the loan (and return) of the stock were considered dispositions, shifting ownership of the stock transferred. As one scholar wrote of the Supreme Court's analysis in *Provost*:

The analysis could not be clearer: a pledgee does not become a tax owner of a pledged stock while a borrower does become a tax owner of a borrowed stock because the pledgee has a limited control over the pledged securities while the stock borrower's control is complete. This result obtains even though a stock borrower gains no economic exposure to the borrowed stock, all of which is retained by a lender. *In other words, control overrides economic exposure in determining tax ownership of a borrowed stock*. [Raskolnikov, "Contextual Analysis of Tax Ownership", 85 B.U. L. Rev. 431, 481–482 (2005); emphasis added. [2]]

Derivium was in the position of a securities borrower who borrows stock to deliver on a short sale, and petitioner was in the position of the securities lender who lends his stock to make that delivery possible. It is enough for me that petitioner gave Derivium the right and authority to sell the IBM common stock in question for its own account, which Derivium in fact did. [3] The nonrecourse nature of petitioner's obligation to repay Derivium, and almost every other factor considered by the majority to determine who bore the "benefits and burdens of ownership", is beside the point. Petitioner disposed of the stock in 2001. Without more, that would constitute a realization event in that year. See sec. 1001(a). Petitioner correctly makes no claim that section 1058 saves him from recognition of income. See *Samueli v. Commissioner*, 132 T.C. 37, 49 (2009) (section 1058(b)(3) requires that the lender be able to demand a prompt return of the lent securi-

---

[2] Professor Raskolnikov builds his analysis on a seminal discussion of the fundamental difference between tax ownership of fungible and nonfungible assets by now Professor Edward Kleinbard. See Kleinbard, "Risky and Riskless Positions in Securities", 71 Taxes 783 (1993).

[3] Apparently, Judge Holmes and I differ on whether petitioner disposed of his stock on Aug. 16, 2001, when Morgan Keegan credited Derivium's account with the IBM stock petitioner transferred, or on the next day, Aug. 17, 2001, when Derivium sold that stock. Although I have no authority addressing that point, I think that, consistent with *Provost v. United States*, 269 U.S. 443 (1926), petitioner disposed of the IBM stock on the prior date; i.e., the date he gave Derivium both the right and authority to sell the stock. I do not believe that applying a similar rule to transactions intended to be securitizations constitutes a change in the law, as Judge Holmes believes. Holmes op. note 1. In any event, sec. 1058 establishes a broad safe-harbor to shelter many securitizations.

ties). We need only determine whether the calculation of gain or loss must remain open, awaiting the determination of whether petitioner closed the transaction in 2004 by acquiring IBM common stock from Derivium. I think not.

Petitioner relies on Rev. Rul. 57–451, 1957–2 C.B. 295, which addresses whether a taxpayer holding stock received pursuant to the exercise of a restricted stock option makes a disqualifying disposition of that stock when he "lends" the stock to a broker in a transaction that would qualify as a disposition under the analysis of *Provost v. United States*, *supra*. The ruling concludes that whether there is a disqualifying disposition turns on whether, at the end of the loan transaction, the taxpayer receives from the broker stock that would qualify for nonrecognition of gain or loss under section 1036. The pertinent facts of the ruling are distinguishable from the facts of this case because, in consideration for his stock, the taxpayer in the ruling appears to have received nothing other than "the personal obligation, wholly contractual, of the 'borrowing' customer to restore him, on demand, to the economic position in which he would have been as owner of the stock, had the 'loan' transaction not been entered into." Rev. Rul. 57–451, 1957–2 C.B. at 297. Perhaps the Commissioner thought the transaction remained open because of the distinct possibility that, apart from the borrowing broker's contractual obligation, the taxpayer would receive only stock that would qualify any gain (or loss) for nonrecognition under section 1036. Cf. *Starker v. United States*, 602 F.2d 1341, 1355 (9th Cir. 1979) (nonsimultaneous transfer qualifies as like-kind exchange "[e]ven if the contract right includes the possibility of the taxpayer receiving something other than ownership of like-kind property").

The ruling may be of limited significance for another reason, since it addresses a definition of "disposition" limited to purposes of determining whether there has been a disposition of stock received pursuant to a restricted stock option. The rules governing restricted stock options were found in section 421 before its amendment by the Revenue Act of 1964, Pub. L. 88–272, sec. 221, 78 Stat. 63, and subsection (d)(4) thereof defined "disposition" as a sale, exchange, gift, or transfer of legal title but not, among other things, an

exchange to which section 1036 applies.[4] The ruling contains insufficient analysis for me to extend it beyond its unique circumstances.

I agree with respondent that petitioner realized $103,985 on his disposition of the IBM common stock in 2001. The parties stipulated that the adjusted basis in the stock was $21,171. Respondent determined that petitioner's realized gain, in 2001, was $72,415, because respondent allowed him to deduct from the amount realized not only his adjusted basis but also $10,399, denominated in respondent's calculation as "cost of sale". Respondent further determined that petitioner must recognize that gain (as long-term capital gain) in 2001. I agree that petitioner must recognize his gain in 2001. It seems to me, however, that the "cost of sale", $10,399, probably represents not a cost of the sale but the nondeductible value of the option that allowed petitioner (if he wished) to buy 990 shares of IBM common stock from Derivium in 2004 for $124,429 plus, perhaps, Derivium's charge for undertaking the transaction.

WHERRY, *J.*, agrees with this concurring opinion.

––––––––––

HOLMES, *J.*, concurring in the result only: Calloway and Derivium agreed to what Calloway claims was a nonrecourse loan secured by his stock. In exchange for money, Calloway transferred control of the stock to Derivium. Derivium sold the stock on the open market. The tax rules would seem to be easy to apply. Section 1.1001–2(a)(4)(i), Income Tax Regs., provides that "the sale * * * of property that secures a nonrecourse liability discharges the transferor from the liability." *Commissioner v. Tufts*, 461 U.S. 300, 308–09 (1983), and *Crane v. Commissioner*, 331 U.S. 1, 12–13 (1947), teach that the amount realized includes any nonrecourse liability secured by the property sold. Calloway would then have to recognize the difference between the discharged debt (i.e., the amount of the loan proceeds plus one day's accrued interest minus his basis in the stock).

That would be enough to solve the only substantive issue in this case. The majority (admittedly at the Commissioner's

–––––––––

[4] A similar rule can now be found in sec. 424(c)(1)(B). Neither rule mentions transfers of securities for which no gain is recognized pursuant to sec. 1058.

behest) instead goes off on a frolic and detour through an inappropriate multifactor test, applies it in dubious ways, and ends up reaching an overly broad holding with potentially harmful effects on other areas of law.

## I.

The key mistake the majority makes is analyzing two transactions as one. These two transactions were the purported loan as set forth in the Master Agreement and Derivium's subsequent secret sale of Calloway's stock to an unrelated party. It's the characterization of the first transaction—the one that Calloway actually knew about because he signed the Master Agreement—that should be our focus. The subsequent sale, though it must be analyzed for its own tax consequences, should not affect our characterization of the purported loan. Accord *People v. Derivium Capital, LLC*, No. 02AS05849 (Cal. Super. Ct. Nov. 5, 2003) ("While the immediate liquidation of the security may have many untoward impacts upon the parties to the transaction, those potential impacts have no apparent relevance to the bona fide nature of the primary transaction.").

The majority concludes that the initial transfer of stock between Calloway and Derivium was a sale without ever finding that Calloway knew that Derivium would sell the stock collateralizing the loan. Its holding is that Derivium's *right to sell* was a sale. Collapsing Derivium's contractual right to sell into the subsequent sale would be appropriate if Calloway was splintering one transaction into two for no other purpose than to avoid taxes—where the transactions were otherwise "integrated, interdependent, and focused toward a particular result." *Pierre v. Commissioner*, T.C. Memo. 2010–106 (describing the step transaction doctrine) (citing *Commissioner v. Clark*, 489 U.S. 726, 738 (1989)). But here, where Derivium represented to its clients that it intended to hold the stock and never told them of the quick sale, one cannot say that these transactions were integrated or interdependent.

## II.

To arrive at its destination, the majority uses *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981). In

*Grodt & McKay*, we had to distinguish between a sale and a sham involving the purported sale of cattle. In this case, the parties aren't arguing about whether there was a sale or a sham, but about whether there was a sale or a loan. If we are going to compare apples to oranges, we could just as easily use the test for distinguishing a loan from compensation in *Haag v. Commissioner*, 88 T.C. 604, 616 n.6 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988), or the test for distinguishing a loan from stock redemption in *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), but those tests, too, contain irrelevant factors and are inexact in capturing the essence of the distinction we need to make in this case. *Grodt & McKay* is just the wrong test for analyzing this transaction.

Of course, if there is no on-point guidance, it is helpful to borrow from tests that may be otherwise inapplicable, if we stay alert to any differing circumstances. In this case I believe there is a more relevant test. *Welch v. Commissioner*, 204 F.3d 1228 (9th Cir. 2000), affg. T.C. Memo. 1998–121, for example, sets out the defining characteristics of a loan, listing seven factors that courts have considered, none of which would have to be dismissed as inapplicable to this case.

A good test should also reflect the nature of the property involved to determine the relevant factors, the proper weight for each factor, and whether any additional factors would be useful. See, e.g., *Torres v. Commissioner*, 88 T.C. 702, 721–22 (1987); Rev. Rul. 2003–7, 2003–1 C.B. 363. The majority starts down the right path by excluding payment of property taxes as a sign of ownership (recognizing its inapplicability to stock), majority op. p. 36, but then it stops short, not analyzing the significant differences between the fungible and intangible property at issue in this case and the nonfungible and tangible property at issue in *Grodt & McKay*.[1] One

[1] Judge Halpern *does* recognize this important difference, and (following some quite persuasive commentators) urges us to adopt "control" as the essential attribute of determining the tax ownership of securities. See Halpern op. p. 51. In almost all tax contexts, the concept of control as the touchstone of ownership seems much better than the ever-pliable multifactor tests that dominate the field. I also agree with him that it offers a much better path in explaining the caselaw, at least before today's result. But it does not adequately distinguish, as I explain below, between secured interests in stock and outright transfers of ownership. Maybe it makes sense to obliterate this distinction, and treat all secured interests in securities as sales if there's been an effective change in control over them, but that big a change is one for the legislative branch,

Continued

would think from reading the majority's opinion that this is a new problem, but it isn't. See, e.g., *United Natl. Corp. v. Commissioner*, 33 B.T.A. 790 (1935) (finding a 100-percent loan on the value of stock, even though originally characterized by the participants as a sale, was in fact a loan); *Fisher v. Commissioner*, 30 B.T.A. 433 (1934) (declining to recharacterize a purported sale of stock as a loan).

III.

The *Grodt & McKay* test might be helpful if the majority adapted it to match the actual facts of this case instead of applying it without consideration of how shares of stock differ from livestock and how distinguishing a loan from a sale is different from distinguishing a sale from a sham. Consider:

*Title and Possession*. The clumsiness of using *Grodt & McKay* is most striking in its focus on title and possession. These factors don't jibe well with the way stock is actually held. As far back as 1908, in *Richardson v. Shaw*, 209 U.S. 365, 377–78 (1908), the Supreme Court realized that a shareholder could retain ownership without title or possession when a broker purchased and held the shares for the shareholder's account:

[I]n no just sense can the broker be held to be the owner of the shares of stock which he purchases and carries for his customer. * * *

*   *   *   *   *   *   *

* * * Upon settlement of the account * * * [the broker] receives the securities. In this case the broker assumed to pledge the stocks * * * because by the terms of the contract * * * he obtained the right from the customer to pledge the securities upon general loans, and in like manner he secured the privilege of selling when necessary for his protection.

Stock ownership today is even farther removed from tangible-property concepts like title and possession owing to the rapid evolution of the indirect holding system. The official title holder of most publicly traded securities, and possessor of most physical stock certificates, is Cede & Co.—"the nominee name used by The Depository Trust Company ('DTC'), a limited purpose trust company organized under

---

not us, to make. In the meantime, we should do our best to come up with a way to distinguish secured loans from sales even when modern conditions make the distinction sometimes hard to figure out.

New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some 600 or so broker-dealers and banks." U.C.C. art. 8 (1994) (prefatory note). The U.C.C.'s drafters[2] estimate that somewhere between 60 and 80 percent of publicly traded securities are held by the brokers and banks that participate in the DTC.[3] If someone within this large network of brokers sells stock to a purchaser also within the network, the purchase and sale are netted against each other and the underlying stock remains in Cede & Co.'s name. See *id.* This means that even when there is an undisputed sale of stock the title holder often does not change. The majority concludes that legal title passed when Calloway "transferred the IBM stock to Derivium's Morgan Keegan account." Majority op. p. 34. But if the IBM shares are titled to Cede & Co.—as most publicly traded stock is—then title didn't actually change.

The right of possession similarly makes some sense when talking of cows. The owner of a cow is likely to be able to put it in the barn of his choice, but possession is unhelpful to determine the owner of shares of stock. Consider a true loan secured by stock. In most cases, creation of a security interest in stock is no longer delivering a physical certificate or noting the pledge on the books of the issuing corporation; it's a matter of contracting with a lender who is (as a matter of contract) allowed to sell, repledge, relend, etc. the stock involved.[4] Under the U.C.C., in fact, a lender with a secured

---

[2] The American Law Institute and the National Conference of Commissioners on Uniform State Laws have often had to revisit the problems caused by the rapid changes in the securities industry. Their most recent revision of Article 8 was "to eliminate * * * uncertainties by providing a modern legal structure for current securities holding practices," U.C.C. art. 8 (1994) (prefatory note), and "to eliminate the uncertainty and confusion that results from attempting to apply common law possession concepts to modern securities holding practices." *Id.* sec. 8–106 cmt. 7. It would be wise for courts in other areas of law to acknowledge these parallel efforts to accommodate changes in the real world.

[3] The DTC is now a subsidiary of the Depository & Trust Clearing Corporation, which sells even more clearinghouse services. The scale of the transactions roiling beneath the placid surface of stable title and possession is mindboggling—annual volume is measured not in trillions, but quadrillions of dollars. The Depository Trust & Clearing Corp., About DTCC, http://www.dtcc.com/about/business/index.php; Securities and Exchange Commission, Testimony Regarding Reducing Risks and Improving Oversight in the OTC Credit Derivatives Market Before the Subcommittee on Securities, Insurance, and Investment of the Senate Committee on Banking, Housing, and Urban Affairs, James A. Overdahl, Chief Economist (July 9, 2008), available at http://www.sec.gov/news/testimony/2008/ts070908jao.htm.

[4] Consider the following language, often found in margin account agreements, where the Borrower gives the Lender the right to "pledge, repledge, hypothecate or re-hypothecate, without notice to me, all securities and other property that you hold, carry or maintain in or for any of my margin or short Accounts * * * without retaining in your possession or under your control

Continued

interest in shares of stock must obtain effective "control" over them to maintain priority—that is, he must take all steps so that he may sell the securities without further permission of the borrower. *Id.* sec. 8–106 cmt. 1. One accepted way to obtain control is to have the borrower transfer his position to the lender on the books of the securities issuer or broker. *Id.* sec. 8–106(d)(1). When this happens, so far as the broker, the securities issuer, or the rest of the outside world is concerned, the secured party is the registered owner entitled to all rights of ownership, but the debtor remains the owner as between him and the secured party. See *id.* sec. 9–207 cmt. 6 (Example) (2000). This makes secured lending collateralized by securities look very similar to a sale if measured by title and possession. See, e.g., *id.* sec. 8–106 cmt. 4.

*Obligation To Deliver Deed*. Perhaps the most striking proof of the inaptness of *Grodt & McKay* for this case is its attention to "whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments." *Grodt & McKay*, 77 T.C. at 1237. The majority construes this to mean an obligation by Calloway to transfer control of his stock and of Derivium to transfer money. Majority op. p. 35. A focus on whether there are current obligations to deliver and pay makes perfect sense in distinguishing between a sale of cattle and a sham transaction. As between those two characterizations, if there is a current obligation to exchange money for possession of cattle the transaction is more likely a sale. But this factor only shows how little use the *Grodt & McKay* test can be in distinguishing a loan from a sale, where there is of course an obligation for Derivium to transfer money—that's the whole point of a loan. And every pledge loan includes a transfer of possession of a chattel (i.e., collateral). That doesn't make pawnshops the buyers of every bit of their collateral. See, e.g., *R. Simpson & Co. v. Commissioner*, 44 B.T.A. 498, 499 (1941) (noting that pawnbroker's business was lending money on personal property), affd. 128

for delivery the same amount of similar securities or other property. The value of the securities and other property that you may pledge, repledge, hypothecate or re-hypothecate may be greater than the amount I owe you." TD Ameritrade, Client Agreement, http://www.tdameritrade.com/forms/AMTD182.pdf; see also Pershing, Credit Advance Margin Agreement, https://www.uvest.com/pdf/Margin%20Account%20Agreement.pdf; Zecco Trading, Margin Application, https://www.zecco.com/forms/margin-application/DownloadForm.aspx.

F.2d 742 (2d Cir. 1942). And in the case of stock, where the concept of possession has become so illusory, the usefulness of execution of a "deed" seems even less helpful than the concept of passing "title".

The rest of the factors don't much help either.

*Whether an Equity Was Acquired in the Property*. The majority refers to this as "Equity Inherent in the Stock", majority op. p. 35, but it isn't clear what "inherent equity" is or how that concept would apply to stock, which is not only intangible and fungible, but divisible. As used in *Grodt & McKay*, this factor describes not rights, but value. *Grodt & McKay*, 77 T.C. at 1238 ("Petitioners ostensibly paid $6,000 per head for cows they knew were worth far less and which we find had a fair market value not in excess of $600 per head."). If anything, this suggests that Calloway retained an equity in the stock for the short time before Derivium sold it. After all, he got only 90 percent of its fair market value. And in finding that this factor weighs in favor of a sale, the majority states that the effectiveness of the arrangement depended on Derivium's ability to acquire and deliver the required number of shares in 2004 but fails to note how this is inconsistent with a loan—the success of every term loan depends on the ability of the parties to perform at the end of the term. (It also assumes that from Calloway's perspective, Derivium wasn't going to keep the collateral in its account and hedge against fluctuations in its value.)

Perhaps the majority intends to suggest that there is a due diligence requirement on the part of the borrower that was not completed here. This makes sense—an apparent inability to return collateral, repay a loan, or fund a loan in the first place would weigh against finding the parties truly intended a loan. See, e.g., *Gouldman v. Commissioner*, 165 F.2d 686, 690 (4th Cir. 1948), affg. a Memorandum Opinion of this Court. But there is no explanation of this point and no indication whether there was anything at the time that should have warned Calloway that Derivium would not be able to perform.

*Risk of Loss and Receipt of Profits From the Operation and Sale of the Property*. In today's world, when dealing with intangible, fungible securities, I agree with Judge Halpern that the benefits and burdens of ownership are "beside the point" in determining who is the owner for tax purposes.

Halpern op. p. 51. Stock owners who want to keep their stock but hedge against risk or sell benefits have long had various methods available to trade away the benefits and burdens of ownership without affecting tax ownership. See Kleinbard, "Risky and Riskless Positions in Securities," 71 Taxes 783, 786 (1993) ("The economic risk/reward analysis applicable in determining tax ownership under a sale-leaseback of a building or other tangible property is difficult to apply sensibly in the context of publicly traded securities."). In some cases, "the traditional determination of who bears market risk is more than simply not dispositive, it in fact is negatively correlated to the tax conclusion." *Id.* at 794. This is consistent with our correlative holding that an option to purchase stock, even though entitling the holder to the benefits of appreciation, isn't a present interest in stock. *Hope v. Commissioner*, 55 T.C. 1020, 1032 (1971), affd. 471 F.2d 738 (3d Cir. 1973). If the majority's analysis is applied broadly, stockowners will be surprised to find out that they unwittingly sold their stock by engaging in common hedging transactions.

As a practical matter, the majority also seems to overlook that Calloway bore the risk of the first 10 percent of loss in that he realized only 90 percent of the stock's value in 2001. It appears to treat the remaining 10 percent as the price of an option (used colloquially, rather than as a derivative instrument of the sort traded in the options markets). The majority also glosses over the fact that Calloway theoretically retained most of the stock's upside via his power to repay the loan for a return of collateral coupled with his right to dividend payments.

IV.

A.

The majority's approach has the potential to wreak some havoc on the unsuspecting. For instance, the majority seems to say that a nonrecourse loan—that is, a loan where the borrower has the option to surrender collateral instead of repay—does not include an obligation to repay. Particularly relevant here, the majority notes that for a loan to exist, "'there must have been, at the time the funds were transferred, an unconditional obligation on the part of the trans-

feree to repay the money, and an unconditional intention on the part of the transferor to secure repayment.'" Majority op. p. 37 (quoting *Haag*, 88 T.C. at 615–16. The majority continues: "Often it comes down to a question of substance over form requiring courts to 'look beyond the parties' terminology to the substance and economic realities.'" Majority op. p. 37. From there the majority concludes that the transaction lacked the characteristics of a true loan because "[p]etitioner would have no personal liability to pay principal or interest to Derivium, and it would have made no sense to do so unless the value of the stock had substantially appreciated." Majority op. p. 38.

That's way too broad a statement of the law if taken seriously. Before this case, nonrecourse loans have satisfied the obligation-to-repay test if, at the beginning of the loan, it would make economic sense for the borrower to pay it off. *Tufts*, 461 U.S. at 312. In other words, if the loan is overcollateralized at its inception, courts find an obligation to repay and a reasonable prospect of repayment. See *Odend'hal v. Commissioner*, 748 F.2d 908, 912 (4th Cir. 1984), affg. 80 T.C. 588 (1983). Events that occur after that time are immaterial to this initial characterization. See *Lebowitz v. Commissioner*, 917 F.2d 1314, 1318 (2d Cir. 1990), revg. T.C. Memo. 1989–178. On the facts of this case, Calloway—whose loan was overcollateralized by 10 percent—had a bona fide obligation to repay.

Nonrecourse financing is a perfectly normal part of the business world. See Robinson, "Nonrecourse Indebtedness," 11 Va. Tax Rev. 1, 10 (1991) ("The legitimacy of financing with nonrecourse indebtedness is widely recognized"). Some states have nonrecourse financing for residential mortgages, e.g., Cal. Civ. Proc. Code sec. 580b (West 1976 & Supp. 2010), and of course the entire pawnshop industry is built on it. See National Pawnbrokers Association, "Pawnbroking Industry Overview" (2008–09), available at http://www. nationalpawnbrokers.org/files/Industry%20Overview%207–7– 09.pdf. A general statement about the unconditional obligation to pay as a key characteristic of debt shouldn't be read

to say that such secured, but nonrecourse, financing isn't a species of loan. [5]

B.

A second way in which the majority's holding is too broad is that it implies that giving a secured lender the right to sell underlying stock without notice to the borrower turns a loan into a sale. But this is common in margin accounts, as the SEC warns: "Some investors have been shocked to find out that the brokerage firm has the right to sell their securities that were bought on margin—without any notification". Securities and Exchange Commission, "Margin: Borrowing Money To Pay for Stocks", http://www.sec.gov/investor/pubs/margin.htm; see also *supra* note 4. And the majority's holding is also inconsistent with the current form of most stock ownership. In the case of stock that is held through an intermediary such as Cede & Co., the U.C.C. refers to the stock owner as the "entitlement holder" and refers to the interest in the stock as the "security entitlement." U.C.C. sec. 8–102(a)(7), (17) (1994). As discussed above, if a stock owner—or "entitlement holder"—wishes to borrow against his "security entitlement," the secured lender must take "control" to maintain priority over other creditors. Borrowers can give a lender control by transferring their position to the lender on the books of the securities intermediary, *id.* sec. 8–106(d)(1), or by arranging for the securities intermediary to act on instructions directly from the lender, *id.* sec. 8–106(d)(2). In essence, a lender has control when he takes "whatever steps are necessary, given the manner in which the securities are held, to place itself in a position where it

---

[5] A common instance of this is borrowing against the value of life-insurance policies. The tax treatment of this phenomenon is easy to understand and (one hopes, even after today) settled as a matter of law. *Atwood v. Commissioner*, T.C. Memo. 1999–61, is a good example. In 1986 and 1988 the Atwoods purchased single-premium life insurance policies. After experiencing some financial difficulty, they decided to borrow against their policies with loans from the insurance company. They received cash immediately and tax free. They had the option to repay the loan plus interest, walk away by surrendering their life insurance policies, or (by paying the premiums) keep the loan outstanding until the policy paid out at their death.

  The Atwoods didn't pay premiums or loan payments, so the insurer allowed the loan to remain outstanding until 1995, when its balance reached the policy's cash surrender value. At that time the insurance company cashed in the Atwoods' policy, but instead of sending a check to them, it paid itself back first. Because this payment otherwise would have been a cash distribution to them, the Atwoods were charged with income when the loan was repaid with their policy proceeds. The lack of an enforceable obligation to repay—beyond surrendering pledged collateral—didn't turn the initial transaction into a sale instead of a loan.

can have the securities sold, without further action by the owner." *Id.* sec. 8–106 cmt. 1. Therefore, a secured lender customarily has a contractual right to sell without notice or demand, subject to its exercise in good faith.[6] See, e.g., *Kaplan v. First Options of Chi. Inc.*, 143 F.3d 807, 818 (3d Cir. 1998) (then-Circuit Judge Alito).

The majority's holding—what I fear it could be boiled down to—is that this transaction was a sale because the advance of money was nonrecourse and Derivium had the authority to sell after taking possession of the stock. Given modern conditions in which a lender's authority to sell stock is routine and even necessary, the real effect of the holding would be to treat all nonrecourse lending against stock collateral as sales. The majority does not appear to realize how startling that would be.

## V.

The *Grodt & McKay* test, like other transaction tests, also notes that the intention of the parties governs the true nature of a transaction. *Grodt & McKay*, 77 T.C. at 1237; see also *Welch*, 204 F.2d at 1230; *United Natl.*, 33 B.T.A. at 794; *Fisher*, 30 B.T.A. at 440. Intent is seen by courts "as evidenced by the written agreements read in light of the attending facts and circumstances". *Grodt & McKay*, 77 T.C. at 1237 (citation omitted). If the test is stated that generally, no one can disagree. But in addition to the problems caused by this test in this case, the majority does not analyze the effect of deception. We are confronted here with one party who was not being honest with the other about its intentions. (The Commissioner admits generally that Derivium told its customers that it intended to hold the stock and hedge

---

[6] Even under the majority's analysis, giving another party the right to sell is not always a taxable disposition. If the parties' agreement follows the guidelines in section 1058(b) then the Code says no gain or loss need be recognized by the stock owner at the time of the initial transfer. Sec. 1058(a). This section generally is applied to allow margin brokers to engage in short sales without tax consequences to the stock owners.

Section 1058 would mitigate the effect of the majority's holding if the right to sell was commonly limited to short sales or other transactions that fit into the confines of section 1058(b). But as discussed above, stock owners also customarily give a secured lender the right to sell for the lender's own protection—e.g., to cover margin calls or repay a loan in default. If a secured lender sells the underlying stock for one of these reasons, then any obligation to return identical securities is typically replaced with an obligation to apply the proceeds of the sale to the outstanding debt. See, e.g., U.C.C. sec. 9–207(c)(2) (2000). This rips the transaction from the protection of section 1058, see sec. 1058(b)(1), and renders the initial transfer taxable under the majority's analysis.

against the upside risk via a proprietary trading strategy. Reqs. for Admis. 264, 276.) Despite the importance of intent in these tests, the majority doesn't address what effect deception has on the characterization of the transaction.

Deception should have been considered at a minimum under the *Grodt & McKay* factor regarding the parties' treatment of the transaction, but the majority merely notes that the parties' treatment was inconsistent with a loan because Calloway admitted that he knew he had authorized Derivium to sell his stock. This knowledge, however, is not inconsistent with a nonrecourse loan secured by fungible collateral—such a provision is standard in brokerage and custodian account agreements where stock secures a loan. See *supra* note 4. The majority fails to mention that Calloway testified that he did not know Derivium had sold the stock and that Derivium sent out quarterly lies that it still held the collateral and credited the amount of dividends paid to reduce Calloway's interest obligation. That, too, however, was part of the conduct of the parties.

The majority similarly notes that Calloway was never required to repay any principal or interest, but this also is consistent with the loan terms—a nonrecourse loan with a balloon payment at the end. We have recognized parties' rights to structure loans as they see fit, even allowing for zero interest. *Welch*, 204 F.3d at 1230 (quoting *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962), revg. 33 T.C. 572 (1959) and *Morris Plan Co. v. Commissioner*, 33 T.C. 720 (1960)); see also Robinson, *supra* at 9 ("Nonrecourse loans created by contract can take whatever form meets the needs of the parties"). And we note that even if the taxpayer does not pay interest during the loan term, upon satisfaction of the debt the full amount of the nonrecourse debt extinguished becomes part of the gain under *Tufts*, 461 U.S. at 308–09, *Crane*, 331 U.S. at 12–13, and section 1.1001–2(a), Income Tax Regs. Accord *Allan v. Commissioner*, 86 T.C. 655, 666–67 (1986), affd. 856 F.2d 1169 (8th Cir. 1988). Therefore the taxpayer pays taxes on discharged interest, so it remains of economic importance.

Finally, the majority notes that the parties did not treat this as a loan because the exact loan amount was not fixed until after Derivium determined the proceeds it would receive from selling the stock. This factor should not impute

knowledge to Calloway that Derivium was selling the stock, however, because it was consistent with the terms of the agreement. Schedule A–1, Property Description and Loan Terms, stated that the total loan amount would be "90% of the market value on closing" and closing was to take place "upon receipt of securities and establishment of * * * [Derivium's] hedging transactions." This is no different from a home equity line of credit whose precise limit depends on an appraisal and subsequent loan-to-value calculation.

## VI.

### A.

Even if we didn't want to accept Calloway's deal as a loan on its face, we should at least use a more sensible multifactor test here. Taking the factors from *Welch* and the old BTA cases would yield a different result:

*Existence of Promissory Note*.[7] While there is no promissory note, the "Master Agreement to Provide Financing and Custodial Services" bears the markings of a loan agreement. The recitals in the contract use loan language, specifying: "This Agreement is made * * * to provide or arrange financing(s) and to provide custodial services to * * * [petitioner], with respect to certain properties and assets * * * to be pledged as security." The services promised in Section 1 include "[p]roviding or arranging financing by way of one or more loans" and "[h]olding cash, securities, or other liquid assets * * * as collateral," actions indicating initial treatment as a loan. Section 9 binds the parties and their assigns. Schedule A–1 lists the interest rate, maturity date, and other terms of the loan. This document therefore acts at least formally as a debt instrument.

*Observing Formalities of Loan*.[8] The parties' continuing course of dealing also supports a finding that they intended to create a loan because they followed through with the loan formalities. Derivium sent Calloway quarterly account statements showing the amount of interest accrued, the loan balance, the maturity date, and the projected balance at matu-

---

[7] *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000) (existence of debt instrument), affg. T.C. Memo. 1998–121; *Fisher v. Commissioner*, 30 B.T.A. 433, 440 (1934) (contents of debt instrument).

[8] See *United Natl. Corp. v. Commissioner*, 33 B.T.A. 790, 794 (1935).

rity. Those statements show that Derivium actually did add interest to the loan balance. The quarterly statements and the end-of-quarter loan balance reflect interest accruing at the agreed rate. Derivium even sent Calloway a notice that the loan term was ending and inquired as to what Calloway intended to do. Calloway responded that he intended to surrender his collateral.

*Interest Payments or Loan Repayment.*[9] It's certainly true that Derivium's loans were structured to provide for a balloon payment. But we have seen loans without interim interest payments before. At one time, lenders tried to get away from paying income tax on interest income by giving "original issue discounts" instead of charging interest. Lenders would extend a supposedly interest-free $95 loan, for example, but then require the borrower to repay $100 at the end of the term. See *Travelers Ins. Co. v. United States*, 25 Cl. Ct. 141, 143 (1992). Congress caught on and enacted section 1281(a), which imputes interest income to holders of original-issue-discount securities, demonstrating that interest can accrue without actual payment during the loan term and without turning the loan into a sale. See also *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57–58, 66 (1965). A loan isn't even required to bear any interest at all if the parties agree. *Welch*, 204 F.3d at 1230 (citations omitted). The Commissioner may have a stronger point if the terms of the purported loan called for interest payments and Calloway didn't pay. But nonpayment of interest according to the terms of the agreement is unpersuasive.

*Duty to Repay and Reasonable Prospect of Repayment.*[10] The Commissioner says Derivium's transactions weren't loans because the customers had the right to walk away. But Calloway didn't have the right to walk away scot free—he had to surrender his collateral. As discussed above, the duty to repay and reasonable prospect of repayment are analyzed differently for a nonrecourse loan. See *supra* pt. IV.A. Nonrecourse loans have satisfied these tests if, at the beginning of the loan, it makes economic sense for the borrower to repay. *Tufts*, 461 U.S. at 312.

---

[9] *Welch*, 204 F.3d at 1230–31.

[10] *Id.*; *United Natl.*, 33 B.T.A. at 796.

*Sufficient Funds to Make Loan*.[11] Our cases also tell us that if a lender doesn't have sufficient funds to make the loan at hand, then the transaction is more like a sale. *Welch*, 204 F.3d at 1230; see also *Gouldman*, 165 F.2d at 690. But after its scam got going, Derivium had sufficient funds on hand until the whole thing collapsed. The record is clear that Derivium sent Calloway funds before it received the proceeds from the IBM stock, so the loan could not have been funded by the sale. See majority op. p. 31 ("On August 21, 2001, Derivium sent to petitioner a letter informing him that the proceeds of the loan were sent to him * * *. On that same date, a $93,586.23 wire transfer was received and credited to petitioner's account"); majority op. p. 30 ("On August 22, 2001, the net proceeds from the sale of the IBM stock settled into Derivium's Morgan Keegan account.").

*Ratio of Price Paid to Property Value*.[12] Without other evidence, if a lender lends full price for the purported collateral it looks like a sale. *United Natl. Corp.*, 33 B.T.A. at 797. But at what discount should the court infer that the parties intended a loan? In *Fisher*, the Board of Tax Appeals noted that a purchase for substantially less than fair market value may allow the Court to rescind a sale from an oppressive "lender", but a small discount coupled with the right to repurchase "does not signify that a loan was intended." 30 B.T.A. at 441. The discount in that case was not enough to recharacterize the purported sale as a loan. This is admittedly a closer question, but when one of Derivium's customers didn't receive full price for his shares and doesn't ask us to change the formal characterization of the transaction, I think this factor is consistent with intent to take out a loan, or at least insufficient to recharacterize the loan as a sale.

*Derivium's Intent and Conduct*.[13] We should be mindful that the various tests in the caselaw require us to consider the conduct of both parties. But "intent" is not exactly the right word for what we think we should be looking for when one of the parties to a deal is trying to deceive another. Derivium's promises of a secret hedging strategy and its con-

---

[11] *Welch*, 204 F.3d at 1230.

[12] *United Natl.*, 33 B.T.A. at 797; *Fisher*, 30 B.T.A. at 441.

[13] *Welch*, 204 F.2d at 1230; *United Natl.*, 33 B.T.A. at 794; *Fisher*, 30 B.T.A. at 440; see also *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981).

tinual flow of false statements to its customers, suggest to any reasonable observer in hindsight that its intent was not to make either a loan or a sale, but a quick theft of 10 percent of the stock's value. But Derivium's actions in other litigation show a desire to at least publicly represent their transactions as loans. E.g., *Derivium Capital LLC v. United States Trustee*, 97 AFTR 2d 2006–2582 (S.D.N.Y. 2006) (stating that California court granted summary judgment motion declaring transactions were loans and that Derivium intended to file bankruptcy motion to get determination that transactions were loans, not sales).

B.

There's no doubt that the facts of this case are ugly. Calloway relied on a promoter in entering the transaction, testified the transaction was tax motivated, and didn't report consistently with his own characterization of the transaction by failing to recognize dividends paid on the collateral as income during the loan term and the disposition of the stock as a sale for the amount of the accrued debt at the close of the loan. These facts, while supporting the result in this case, may differ significantly from cases where Derivium's customers were dupes rather than, at least to some degree, in on the con. Never mind, says the majority, in both classes of case, the initial transfer of stock from a customer's account to Derivium's is a sale for tax purposes. [14]

But to return to where I began, this case and all the Derivium cases should be easy. If there was a bona fide nonrecourse loan, followed by the sale of collateral, the tax rules are clear. According to section 1.1001–2(a)(4)(i), Income Tax Regs., "the sale * * * of property that secures a nonrecourse liability discharges the transferor from the liability." And when a nonrecourse liability is discharged by sale of collateral, the borrower must recognize income at that point—the amount realized is the amount of nonrecourse liability discharged as a result of the sale. [15] *Tufts*, 461 U.S. at 308–09;

[14] These worries are somewhat alleviated by the majority's appropriately narrow application of the penalties. In finding for the Commissioner on that issue, the majority relies exclusively on Calloway's personal treatment of the transaction—including his failure to report consistently with a loan, his reliance on a promoter, and his failure to prove reasonable reliance on other professionals.

[15] The timing of the recognition event would be the same if the loan were a recourse loan, but there are some differences in tax treatment when a recourse loan is satisfied by the sale

*Crane*, 331 U.S. at 12–13; *Fisher v. Commissioner*, T.C. Memo. 1986–141 (treating stamp collection as sold by taxpayer in year pawnbroker sold it as opposed to year taxpayer received money from pawnbroker). The first transaction, then, would not be a recognition event for Calloway but Derivium's sale—even its secret sale—would. [16] In this case, because the two events were nearly simultaneous, the tax consequences to Calloway would be remarkably similar to those flowing from the result reached by the majority. [17]

There are, finally, some potentially odd consequences of this opinion. Consider first an easy variation—a simple collateralized loan subject to the same standard contract language as in Derivium's forms. The stock stays in the lender's electronic equivalent of a desk drawer, the borrower repays the loan and regains control of the stock. Does this become a sale on the initial transfer? And a repurchase when the loan is repaid?

Or consider the example of subordination loans—stocks transferred by an owner to a broker or dealer. The transferor keeps his voting rights and dividends, but gives the transferee the right to sell the transferred stock and retain the proceeds. (This sort of deal is beneficial to the transferor because he gets a stream of payments equal to a percentage of the value of the securities he's transferred. And it's beneficial to the broker or dealer because such securities count toward his minimum net-capital requirements.) Courts have always called these loans rather than sales, despite the right of the transferee to sell. See, e.g., *Cruttenden v. Commis-*

---

of collateral for less than the debt amount. In that case the stock owner would recognize gain or loss of the sale price less his basis, plus cancellation-of-debt income in the amount of the debt forgiven less the sale price. See *Gehl v. Commissioner*, 102 T.C. 784, 789–90 (1994), affd. without published opinion 50 F.3d 12 (8th Cir. 1995); sec. 1.1001–2(a), Income Tax Regs.; Rev. Rul. 90–16, 1990–1 C.B. 12. The cancellation-of-debt income would potentially be subject to an insolvency exclusion. See sec. 108(a)(1)(B).

[16] The U.C.C. also seems to agree with this outcome. As noted above, while a secured party holds securities, as between the two the debtor is considered the owner of the securities. U.C.C. sec. 9–207 cmt. 6 (Example). But if the secured party sells the underlying securities "by virtue of the debtor's consent or applicable legal rules" then "the debtor would normally would retain no interest in the securit[ies] following the purchase [by a third party] from the secured party." *Id.* sec. 9–314 cmt. 3.

[17] Because of a small amount of accrued interest, from the time the loan was made until the stock was sold, Calloway would actually have a slightly higher deficiency if we found his transaction to be a bona fide loan. The Commissioner hasn't made any claim for this little bit of extra deficiency, so he wouldn't get it. See *Baker v. Commissioner*, T.C. Memo. 2008–247 (citing *Estate of Petschek v. Commissioner*, 81 T.C. 260, 271–72 (1983), affd. 738 F.2d 67 (2d Cir. 1984), and *Koufman v. Commissioner*, 69 T.C. 473, 475–76 (1977)).

*sioner*, 644 F.2d 1368, 1374–75 (9th Cir. 1981), affg. 70 T.C. 191 (1978); *Lorch v. Commissioner*, 605 F.2d 657, 660 (2d Cir. 1979), affg. 70 T.C. 674 (1978).

Or, perhaps especially, consider the increasingly complex financial instruments like repos and customized derivatives. All of these alter the "benefits and burdens" of ownership, but some that take on the form of sales are treated as loans. Kleinbard, *supra* at 798 & n.79 ("For tax purposes, repos traditionally have been treated as secured loans of money." (citing Rev. Rul. 79–108, 1979–1 C.B. 75, Rev. Rul. 77–59, 1977–1 C.B. 196, and Rev. Rul. 74–27, 1974–1 C.B. 24)); see also *Neb. Dept. of Revenue v. Loewenstein*, 513 U.S. 123, 130–31 (1994) (finding repos are loans for purposes of 31 U.S.C. section 3124(a)). Must all now be subject to the uncertainty of the *Grodt & McKay* test?

I respectfully concur in the result in this case and even the imposition of penalties (because Calloway did not respect his own characterization of the transaction as a loan). But unless future courts treat our analysis today as a limited-time ticket good only on Derivium cases, we may be creating more problems than we're solving.